No. 64,224

STATE OF KANSAS, *Appellee*, v. SHARI LYN BIERMAN, *Appellant*.

(805 P.2d 25)

Opinion filed January 18, 1991.

*John J. McNally*, of Kansas City, argued the cause and was on the brief for appellant.

*Nick A. Tomasic*, district attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: Defendant Shari Lyn Bierman was convicted of theft over $500 (K.S.A. 21-3701) and first-degree murder (K.S.A. 1989 Supp. 21-3401) in the killing of her 17-year-old sister, Syndi.

The issues for resolution relate to: (1) Bierman's motion for change of venue; (2) her right to a speedy trial under K.S.A. 22-3402(1); and (3) the sufficiency of the evidence to sustain a conviction for premeditated first-degree murder.

We find no error and affirm.

### Facts

On Sunday, February 19, 1989, at approximately 3:11 a.m., a Wyandotte County Sheriff's dispatcher received a phone call from Shari Bierman. Bierman stated that her house had been broken

into. She believed someone might still be inside. She was advised to go next door and call back. Officers were dispatched to the residence. Approximately 30 seconds after her first call, Bierman called back stating that her sister was on the floor and there was blood all over. The second call also was placed from the Bierman home.

The first officers arrived at the Bierman home at approximately 3:20 a.m. As the officers approached, Bierman opened the front door, grabbed one of them, and pulled him toward an inside stairway. She was hysterical. She told the officers that someone had killed her sister and that the suspects might still be in the house. The body of Bierman's sister, Syndi, was found in Syndi's upstairs bedroom. No one else was in the house. Portions of the house had been ransacked and several items were missing.

Bierman, who was recently divorced, lived with her two sons, ages one and three, in the finished basement of her parents' home. Her parents and Syndi, her only sibling, lived in the upstairs.

Bierman told the police officers that she left home at 11:00 p.m., returned at 3:00 a.m., and discovered the burglary and her sister. She stated that Syndi and two of Syndi's friends, Renea and Lisa, were at the residence when she left. She said no one else was at the house that evening. Bierman was not a suspect at this time.

Bierman became a suspect after the police questioned Renea and Lisa.

Renea and Lisa told police that someone named A.J. (Archie Owens, Jr.) was home with Bierman. They also stated that Syndi was scared of Bierman.

Matt, Syndi's boyfriend, testified that on the Thursday before her death, Syndi told him that Bierman had threatened her. Syndi was scared and did not want to go home. Matt talked to Leonard Bierman, Shari and Syndi's father, the morning after Syndi was killed. Matt testified the father said, "I bet my last dollar she [Shari] did it." Mr. Bierman did not remember making the statement, but did not deny it.

Shari Bierman was taken to the police station for questioning. Initially, she repeated her statement that she left at 11:00 p.m., returned at 3:00 a.m., and no one else was with her at the house.

When confronted with the fact that other people knew she had someone at home that evening, Bierman said that Brian (apparently an acquaintance) was there. She then admitted that Joseph Hernandez and Archie Owens were at the house with her and that they all left at 11:00 p.m. She said Hernandez and Owens would not do anything like stealing property or killing her sister. The stolen property was later found at Owens' apartment.

On February 21, 1989, Hernandez and Owens were charged in Wyandotte County District Court with first-degree murder and theft over $500. Bierman was charged with theft over $500 and with aiding a felon. On February 23, 1989, a second amended information also charged Bierman with first-degree murder.

Hernandez pled guilty to first-degree murder. In a plea agreement, he agreed to testify against Bierman and Owens.

The trial of Bierman and Owens commenced on June 26, 1989.

### Hernandez' Story

Hernandez testified that he had known Bierman about a year. He had seen her one to three times a month. They were not dating. He saw her for sexual relations. On February 18, 1989, Hernandez was living with Owens and Owens' girlfriend, Tambi Lewis. On that day, he phoned Bierman between 5:00 p.m. and 5:30 p.m. They agreed to see each other. Owens was driving Hernandez to Bierman's residence in Lewis' car. They stopped and called Bierman, who did not object to Owens coming along.

They arrived at Bierman's house at approximately 6:30 p.m. After 20 to 25 minutes, Owens, Hernandez, Bierman, and Bierman's two children drove to a babysitter and left the children.

After driving around for a while, the three returned to the Bierman residence, parked in the garage, and then entered the basement apartment. Syndi's car and two others were at the house. Bierman used the phone as an intercom and talked to Syndi upstairs to see who was there. Bierman did not want Syndi to know "she had two guys downstairs."

According to Hernandez, they then had three-way bondage sex. Afterward, Hernandez and Owens suggested that they "steal" things from Bierman's parents' house. Bierman said she did not care. Hernandez admitted that he and Owens had talked earlier about stealing from the Biermans' house.

Shortly before midnight, Owens, Hernandez, and Bierman left the Bierman home. Owens drove Lewis' car back to his apartment. Bierman and Hernandez used Bierman's car to pick up her children. They took the children to Owens' apartment. Bierman left the children with Lewis and Tina Reilly, a 15-year-old runaway, while Hernandez, Owens, and Bierman proceeded back to the Bierman home.

Hernandez testified that Bierman directed them to a construction site to pick up two-by-fours "in case they had to knock someone out."

Bierman said that only her sister would be home and that if they were quiet they would not wake her up; they could just take the things and leave. Upon arriving, Hernandez tried to go downstairs while Owens and Bierman went upstairs. The basement door was locked so Hernandez followed Owens and Bierman upstairs. Hernandez and Owens each carried a two-by-four.

Bierman "stomped" on the way up the stairs to make noise. They were outside Syndi's bedroom. The bedroom door was open. Syndi began to wake up and asked who was there. Hernandez hit Syndi three or four times with a two-by-four. Owens hit her two or three times with a two-by-four. Owens' two-by-four had nails it it. Syndi rolled off the bed and began screaming. Hernandez pushed a pillow over her face. Owens hit her on the head. Hernandez moved downstairs and gathered up things to take from the home.

Hernandez heard Owens tell Bierman "to get her." Bierman said, "You fucking bitch." Then he heard a thump. Owens told Bierman to get some knives. Bierman left and returned to the bedroom from downstairs with two knives. Hernandez denied cutting or stabbing Syndi or being present while anyone cut or stabbed her.

Four kitchen-type butcher knives were introduced as exhibits by the State. Blood was on the knife found on the floor in Syndi's bedroom, and on the knife found under the dining room table. The blood could have been Syndi's or Bierman's; analysis excluded Owens' blood as well as that of Hernandez.

Hernandez testified that he kicked open the locked basement door and unplugged the computer and printer. Bierman was still upstairs. Hernandez, Owens, and Bierman took a computer,

printer, VCR, camera, two watches, tapes, a mirror, and $60. Hernandez identified the stolen property recovered from Owens' apartment. All three helped load the car. They took the two-by-fours with them.

Bierman, Owens, and Hernandez moved the stolen property and the two-by-fours into Owens' apartment. Lewis, Reilly, and Bierman's children were there. Hernandez went to a downstairs apartment and asked Tina Buck and "some other girl" how to get blood off of his shoes. Bierman told him to shut up and come upstairs. Hernandez told her to go home and call the police. Bierman left with her children. He stated that he never threatened Bierman. The last thing Bierman said to Hernandez was, "I'll talk to you later."

### The Stories of Reilly, Lewis, and Buck

Reilly testified that Hernandez told her that he, Owens, and Bierman had beaten Syndi and that he had slit her throat because Syndi was yelling.

Lewis pled guilty to aiding a felon. Lewis testified that she was at Owens' apartment the night of February 18 and the morning of February 19, 1989. Owens, Hernandez, and Bierman dropped off Bierman's children. They said they were going to burglarize Bierman's parents' house. Bierman did not object. When they came back, Bierman helped carry the stolen property into the apartment. Lewis said Owens told her that all three had beaten Syndi up. Owens said in front of Bierman, "Well, Shari don't care about her little sister anyway." Bierman replied, "I hate that little bitch."

Tina Buck testified that Hernandez came to the apartment below Owens' late that night or early the next morning. Hernandez told her that he had killed a 17-year-old girl. He said that he had slit her throat and that Owens had stabbed her. In front of Buck, Hernandez asked Bierman how to get blood out of leather. Bierman told him to shut up.

### Bierman's Story

Bierman testified that Hernandez and Owens came to her house on Saturday, February 18, 1989, at 7:00 p.m. The three took her children to a babysitter. Owens, Hernandez, and Bierman ultimately returned to her house. They went directly to Bierman's basement bedroom. Syndi, Lisa, and Renea were upstairs. Bier-

man stated that she, Owens, and Hernandez left around 11:30 p.m. Owens drove Lewis' car to his apartment. Bierman and Hernandez picked up her children in Bierman's car. After picking up the children, Hernandez and Bierman took them to Owens' apartment. Owens was already there.

Bierman left her children at Owens' apartment with Lewis. Owens, Hernandez, and Bierman returned to Bierman's house. They went downstairs to her bedroom. Owens left the room; Bierman and Hernandez had sex. Bierman denied having three-way bondage sex. (However, Owens' chain-belt was found in her bedroom.) After Hernandez and Bierman dressed, they went upstairs at Hernandez' suggestion. Bierman had not seen Owens since he left the bedroom. Hernandez commenced throwing things off the TV. Bierman asked, "What are you doing?" Hernandez told her to shut up. She ran downstairs, locked the push button lock on the doorknob, and fastened the door chain.

Bierman testified that she heard things hitting the floor. She stated that she did not know if Syndi was home. The basement door was kicked in five to ten minutes later. Bierman did not use the phone in her bedroom to call the police. Hernandez said, "Lets go—Do what I say or I'm going to do it to you." Bierman was scared. Hernandez put the computer in the car. Other items from the Bierman home were already in the car.

Bierman then drove back to Owens' apartment because, as she stated, "I had to go get my babies." She picked up her children. Bierman denied helping unload the stolen property. Hernandez told her to call the police, report a burglary, and not tell who did it.

Bierman left Owens' apartment at approximately 2:00 or 2:30 a.m. She drove around trying to calm down before going home. Bierman used the kitchen phone to call 911 to report a burglary. At that time she was not aware that anything other than a burglary had taken place. She went upstairs to her parents' bedroom and then to her sister's bedroom. She saw her sister. Blood was everywhere. Bierman called the police from her parents' bedroom. She denied any knowledge of the two-by-fours before seeing them in court.

### The Coroner's and the Pathologist's Testimony

Dr. Alan Hancock, the Wyandotte County Coroner, went to

the Bierman residence shortly after Syndi's body was discovered. He testified at trial that there were wounds on Syndi's hands and arms which appeared to be defensive, and that her throat was cut after she had been beaten and when she was in "deep profound shock." Dr. Hancock concluded that the entire episode took several minutes to occur.

Dr. Philip vanThullenar, the pathologist who conducted the autopsy, testified that there were many wounds on Syndi's head and neck, her cheekbone was fractured, and the bone above her eye was fractured and displaced. vanThullenar identified a faint oval bruise on Syndi's right forehead. The bruise had a number of evenly spaced crossmarks. It was typical of a shoe mark. vanThullenar stated that the bruise was probably from the sole of a woman's shoe. There were seven superficial wounds on the left side of Syndi's neck. A wound on the right side of her neck cut the carotid artery and the jugular vein. Stab wounds were identified on each side of Syndi's abdomen. vanThullenar determined from the amount of blood in the tissues that the head wounds were inflicted first, then the neck wounds, followed by the wounds to the abdomen. The cause of death was loss of blood.

### Bierman's Motion for Change of Venue

Bierman filed a motion for change of venue in April 1989. Owens also had filed a similar motion. The motions were heard together. Owens introduced two affidavits and numerous newspaper articles. Bierman introduced 63 newspaper articles. Her counsel read from a letter to the editor published in a local newspaper, the Kansas City Kansan. The letter concluded, "I hope the woman [Bierman] pays for her heinous crime."

The motions were denied. The district court relied upon State v. Salem, 230 Kan. 341, 343-44, 634 P.2d 1109 (1981).

The district court found Bierman and Owens had not presented sufficient evidence to meet the Salem standards. The district court observed: "If, during the jury selection of the case at bar, it becomes evident that it will be inordinately difficult or practically impossible to select an impartial jury, then the issue of venue should be reconsidered."

Bierman advances the conclusory argument that the trial court committed reversible error in denying her motion for change of venue. She repeats the argument made to the trial court—the

extensive media coverage prevented Bierman from receiving a fair trial.

The State contends Bierman failed to show sufficient prejudice and failed to raise the issue at the time of jury selection. The State's contention has merit.

K.S.A. 22-2616(1) states:

"In any prosecution, the court upon motion of the defendant shall order that the case be transferred as to him to another county or district if the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county."

In *State v. Sanders,* 223 Kan. 273, 280, 574 P.2d 559 (1977), we listed the rules regarding change of venue: (1) the burden to establish prejudice is on defendant, (2) not only prejudice must be shown but the prejudice must be such as to make it reasonably certain the defendant cannot receive a fair trial, (3) speculation as to possible prejudice is not sufficient, (4) the State is not required to produce evidence to refute affidavits obtained by defendant, (5) the granting of a change of venue lies within the sound discretion of the trial court, and (6) the trial court's ruling thereon will not be disturbed absent a showing of prejudice to the substantial rights of the defendant.

In *State v. Myrick & Nelms,* 228 Kan. 406, 417, 616 P.2d 1066 (1980), we again reviewed the question of the existence of prejudice against a defendant sufficient to justify a change of venue. Specific facts and circumstances must be established to indicate it will be practically impossible to obtain an impartial jury to try the case. Such a showing may not be based on speculation.

Extensive media coverage alone does not establish prejudice per se. *State v. Hunter,* 241 Kan. 629, 635, 740 P.2d 559 (1987).

In the case at bar, 150 jurors were called for selection to the jury and were sworn for the voir dire examination. The trial court excused eight persons for various reasons not related to impartiality.

At one point, the district attorney asked if anyone had not been exposed to the case. Only three of the remaining jurors had not. The jurors were asked if they could forget about any preconceived notions and decide the case on the evidence. After extensive examination, the district attorney passed the jury panel for cause.

Owens conducted an extensive voir dire examination. He also mentioned the publicity and asked if the jury could be impartial. Jurors Whytus and Chow admitted that they had already formed an opinion. They were challenged by Owens. The trial court excused them. Owens challenged a third juror who said she could not be fair and impartial. The trial judge excused the juror. Owens passed the jury panel for cause.

During her voir dire examination, Bierman challenged two jurors for cause because they could not look at gruesome pictures. The trial judge excused the jurors. Bierman challenged another juror who was acquainted with the victim; he was excused. Bierman then passed the jury panel for cause. The voir dire examination lasted one and one half days. Only five jurors were challenged for cause. The trial judge excused all five. Bierman did not renew her motion for change of venue. There appears to have been no difficulty selecting an impartial jury. See *State v. Hunter*, 241 Kan. at 636.

Bierman has failed in her burden to (1) establish prejudice and (2) prove that there existed such prejudice that she reasonably could not have received a fair trial.

### Bierman's Right to a Speedy Trial

Bierman contends that her statutory right to a speedy trial under K.S.A. 22-3402(1) has been violated. She acknowledges that the trial commenced with the voir dire on the 90th day following arraignment. However, Bierman argues that the K.S.A. 22-3402(1) phrase "brought to trial" requires that the defendant must be placed in jeopardy within 90 days. She cites no authority for her position. Bierman's contention is without merit.

Under K.S.A. 21-3108(1)(c), a defendant is placed in jeopardy when the jury has been impaneled and sworn to try the case. Bierman points out that the jury was not sworn to try the case until the 91st day. The K.S.A. 22-3402(1) phrase, "brought to trial," does not coincide with the date a defendant is placed in jeopardy under K.S.A. 21-3108(1)(c), but rather relates to the date the jury panel is sworn for the voir dire examination.

The State advances three counterarguments: (1) Bierman filed numerous motions which were not ruled on for 13 days; the 13-day period should be charged to Bierman; (2) the trial court

extended the 90-day period under K.S.A. 22-3402(3)(c) and (d); and (3) Bierman was brought to trial within 90 days.

K.S.A. 22-3402 requires any person charged with a crime and held in jail to be brought to trial within 90 days after arraignment unless the time of trial is extended under the statute.

Bierman was arraigned on March 28, 1989. On May 11, 1989, the case was set for trial on June 26, 1989. The journal entry reflecting the May 11, 1989, hearing stated:

"The Court further finds that all attorneys agree that a special setting is required with special notice being provided.

"The Court further finds that the criminal trial docket schedule is set through the week ending June 9, 1989; that the courts have prior commitments for the entire week of June 12, 1989; and, that a material witness for the prosecution will be out of the state from June 17, 1989 through June 24, 1989.

"The Court further finds that June 26, 1989 is the ninetieth (90th) day after both defendants were arraigned."

The trial court's order stated: "WHEREFORE, IT IS ORDERED that pursuant to K.S.A. 22-3402(c) and (d), the jury trial in this matter is set before the Honorable Bill D. Robinson, Jr., on June 26, 1989, at 9:00 A.M." The order is a permissible extension under K.S.A. 22-3402(3)(c) (time of trial extended beyond the 90 days because material evidence is unavailable) and (d) (time of trial extended beyond the 90 days because of other cases pending for trial). Even if Bierman's jeopardy argument were meritorious, the trial court properly extended the time.

Bierman was "brought to trial" within 90 days. K.S.A. 22-3405(1) states: "The defendant in a felony case shall be present at . . . *every stage of the trial including the impaneling of the jury.*" (Emphasis added.) A defendant is "brought to trial" when the jury panel is sworn for the voir dire examination.

The jury panel was sworn for the voir dire examination in the case at bar within 90 days of the arraignment. Bierman's statutory right to a speedy trial under K.S.A. 22-3402(1) was not violated.

It is not necessary to address the State's argument that the 13 days Bierman's motions were pending should be charged to Bierman.

### Sufficiency of the Evidence

The trial court instructed the jury on premeditated first-degree murder, felony first-degree murder, and second-degree murder.

The trial court also gave the following aiding and abetting instruction:

"A person who, either before or during its commission, intentionally aids, abets or advises another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

The jury returned a verdict of guilty of premeditated first-degree murder.

Bierman asserts that there was insufficient evidence to support the element of premeditation. Her assertion is not well taken.

The standard of review is whether a review of all the evidence, viewed in the light most favorable to the prosecution, convinces us that a rational factfinder could have found Bierman guilty beyond a reasonable doubt. *State v. Graham,* 247 Kan. 388, Syl. ¶ 5, 799 P.2d 1003 (1990).

We discussed the element of premeditation in *State v. Hill,* 233 Kan. 648, 652, 664 P.2d 840 (1983).

Direct evidence is not necessary to establish premeditation. It may be established by circumstantial evidence. Premeditation may be inferred from the established circumstances of the case provided the inference is reasonable.

In the case at bar, Matt, Renea, and Lisa (Syndi's friends) all testified that Syndi told them that she was afraid of Bierman. Renea and Lisa also testified that Bierman got mad, on the night of the murder, when Syndi commented about Bierman wearing Syndi's jeans.

Hernandez testified that Bierman directed the trip to the construction site to pick up the two-by-fours. Bierman was present while Hernandez and Owens brutally beat Syndi with the two-by-fours. Hernandez heard Owens tell Bierman "to get her," and then heard Bierman say, "You fucking bitch," followed by a thump. The pathologist testified that there was a bruise on Syndi's forehead that was probably made by a woman's shoe. Hernandez further testified that Bierman took the knives upstairs.

Lewis testified that after the murder Bierman said, "I hate that little bitch."

There is no evidence of any provocation by Syndi. She was asleep in bed.

The coroner testified that there were many defense wounds on Syndi's hands and arms. He stated that Syndi's throat was cut after she was beaten and was in "deep profound shock." He concluded that the death episode took several minutes.

We conclude there was sufficient evidence to support the jury's verdict of premeditated first-degree murder.

Affirmed.