No. 70,165

STATE OF KANSAS, *Appellee*, v. ANDREW JUAN ANTHONY,
*Appellant*.
(898 P.2d 1109)

Opinion filed June 13, 1995.

*Charles E. Atwell*, of Wyrsch Atwell Mirakian Lee & Hobbs, P.C., of Kansas City, Missouri, argued the cause, and *Jacqueline A. Cook*, of the same firm, was with him on the briefs for appellant.

*Julie McKenna,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Andrew Juan Anthony, along with Artis Swafford and Joel Butler, was convicted in a joint jury trial of premeditated first-degree murder and aggravated robbery. Anthony was also charged with and convicted of sale of cocaine within 1,000 feet of a school and unlawful possession of a firearm. Anthony contends that the court erred by denying his motions for (1) change of venue, (2) severance of the counts of sale of cocaine and unlawful possession of a firearm, (3) separate trial from the codefendants, and (4) a continuance so that he could be represented by his chosen counsel. He also argues that the charge of unlawful possession of a firearm was duplicitous and that the district court erred in admitting certain hearsay statements. Finding no reversible error, we affirm.

Early in the morning on August 10, 1992, the Mid-America Inn in Salina was robbed, and the night clerk, Oliver Bigler, was murdered. Police were called to the scene when Audrey Wright, who arrived at the motel at approximately 4:50 a.m. to open the restaurant, found the door locked and was unable to summon the night clerk.

Officer Glen Soldan of the Salina Police Department testified that he arrived at the motel at 5:30 a.m. and went to check the back door. Approximately 25 feet from the back door, Soldan found a safe lying in the grass near a white plastic ice bucket and a canvas bag. Soldan testified that he attempted to enter the motel through the back door but the deadbolt lock was engaged.

Eventually, the manager of the motel arrived with a key to the motel office. Inside, police found the office area splattered with blood, and they discovered Bigler's body lying in front of the desk. Bigler had sustained severe trauma and lacerations to the head, and police discovered a letter opener embedded in Bigler's neck.

David Klamm, a special agent with the Kansas Bureau of Investigation, searched the office area. He found a broken and blood-stained BB gun, along with some pieces of wood that looked as if they had come from the stock of the gun. Kelly Robbins, a KBI

forensics examiner, testified that she found a blood-stained brick. Officers also found what appeared to be a broken piece of a collapsible antenna. A police dog searched the wooded area east of the motel and discovered a handgun.

An autopsy revealed that Bigler had suffered severe trauma to the head as well as severe stab wounds and lacerations, including a stab wound in the right ear canal. In the opinion of Dr. Norman Macy, death was caused by several severe blows which destroyed the front of the head and tore the brain in half. The head injuries were consistent with those that could have been caused by a brick or gun stock.

Anthony was arrested and charged with premeditated murder, felony murder, aggravated robbery, sale of cocaine within 1,000 feet of a school, unlawful possession of a firearm, possession of drug paraphernalia, and possession of cocaine with intent to sell. He was also charged with three other counts of sale of cocaine. Three other individuals, Joel Butler, Artis Swafford, and Jennifer Harmon, were also charged as a result of the murder and robbery. Anthony, Butler, and Swafford were ordered to stand trial jointly.

Anthony filed a motion to separate the sale of cocaine charges that occurred prior to the robbery and murder. The district court agreed to sever those counts. His motion to be tried separately from the codefendants on all charges was denied.

Anthony and codefendants Butler and Swafford filed a motion for change of venue, contending that pretrial publicity created a substantial likelihood that they would not receive a fair trial. In support of the motion, Randall Picking of KSAL radio in Salina was called and testified that his station broadcast a call-in show that dealt with the crime on the day of the defendants' arrests. Raymond Pollard, vice-president of KSKG radio in Salina, was also called as a witness and stated that his station reported stories on the murder, including the names of the persons arrested. George Pyle, editor of the Salina Journal, testified that he published articles which had detailed the prior convictions of Anthony as well as stories which stated that Anthony's neighbors were afraid of him because he and his friends carried guns and had all-night parties. Pyle also stated that the Salina Journal printed a story on the trial testimony with

a headline stating that Anthony had planned the robbery and murder. Other radio news directors testified that they had run stories on the murder and suspects.

At the hearing on the motion to change venue the defendants presented the testimony of Dr. James Franke, the director of the Survey Research Unit at the Kansas State University Institute for Social and Behavioral Research. Dr. Franke testified that he had conducted a public opinion poll to test the public's knowledge of the case. The results of the survey indicated that out of approximately 366 persons surveyed, 97% had heard of the case and approximately 50% thought that the evidence was strong against all the suspects.

The district court determined that the defendants had failed to show prejudice to such a degree that it would be impossible to obtain an impartial jury. Accordingly, the court denied the motion.

Twenty days before the joint trial of the three defendants was to start, Anthony moved the court to allow his appointed counsel to withdraw and his retained counsel to file an entry of appearance. However, the defendant's motion for retained counsel to represent him was contingent on the court granting a continuance so that retained counsel would have sufficient time to prepare for trial. Anthony retained Charles Atwell of Kansas City to represent him, but Atwell indicated he would not be able to render effective assistance of counsel if the trial started on time. The motion filed by Anthony detailed avenues that Atwell would pursue if he were allowed a continuance, including issues of mitigation and discovery.

The court affirmed Anthony's right to his attorney of choice but refused to grant a continuance to allow the counsel to enter the case. The court noted that Anthony had already received one continuance, that codefendant Butler opposed the continuance, and that the joint trial was to commence in two weeks.

Trial commenced as scheduled on February 16, 1993. The State called Marilyn Jensen, who testified that she was traveling through Salina in the early morning hours of August 10, that she stopped at the Mid-America Inn around 1:00 or 2:00 a.m., and that an older gentleman, presumably Bigler, directed her to the Ramada Inn because the Mid-America Inn had no vacancy. The desk clerk at

the Best Western Heart of America Inn, another Best Western in Salina, testified that the last contact she had with Bigler was at 2:00 a.m.

Officer Randy Jennings of the Salina Police Department testified that he had stopped Anthony at approximately 2:38 a.m. for running a red light. According to Jennings, Anthony drove off heading north after receiving a traffic warning. Earlier that evening, Jennings had arrested Orvin Mixon for driving while suspended. Co-defendant Artis Swafford was a passenger in the car and was allowed to drive Mixon's auto away.

Don Dean, general manager of the Mid-America Inn, testified that there were only two keys to the back door, one of which was kept at the office. He identified the safe found outside the door as the one that was kept in the office and the place where all the business proceeds and receipts were kept. He identified the white bag found outside as the bank bag where the small bills were kept.

Robert Taylor, a desk clerk at the Mid-America Inn, stated that in order to open the cash register, the button marked "room number" must be depressed. There had been two previous robberies of the motel that summer, and everyone who worked there thought it was an "inside job" because during the robbery the robber knew how to open the cash register.

Lieutenant Kiltz, along with other officers from the Salina Police Department, executed a search warrant for the home of Anthony and his mother. Kiltz found a .38 revolver inside Anthony's bedroom. Officer Mike Briggs found a battery operated walkie-talkie with a broken antenna inside an empty dog food bag. The antenna piece found at the crime scene matched the piece of the antenna found in Anthony's trash can. Sergeant Sweeney found another walkie-talkie, a $10 roll of quarters, and a Tec 9 handgun.

The State called Kit Phifer, who testified that she knew the defendants and that on August 9 she was with friends Karen Renee Greer, Sunshine Daniels, and Stephanie Neustrom. According to Phifer, the other girls took her home early that evening. The next morning she called Greer. Phifer asked Greer if she knew about the robbery, and Greer indicated that she did. Later, Greer told Phifer that Anthony had showed her a key to the motel office.

Sunshine Daniels testified that she had known the defendants for about a year but that the night of August 9 was the first time that Greer had met Anthony. According to Daniels, after the group had dropped Phifer off, they went to Anthony's house. Daniels testified that Greer told her the next day that she and Anthony had gone to a barbecue at Orvin Mixon's house the night of the crime. However, Daniels said that Greer later told her that Anthony had planned the murder and told her about it. Daniels also testified that Greer also told her that she had sex with Anthony that night.

Stephanie Neustrom testified on behalf of the State that she had a sexual relationship with defendant Joel Butler. A few days after the crime, Neustrom talked with Greer, who told her that Anthony had left the house in the middle of the night to rob the Mid-America Inn.

The trial court overruled hearsay objections on the basis of the coconspirator exception to the hearsay rule. Neustrom was permitted over objection to relate that Greer told her Anthony had planned to rob the motel and injure the clerk and that Greer helped Anthony count money when he returned.

Greer was called as a witness for the State. She stated that after taking Daniels and Neustrom home, she and Anthony went back to his house and had sex. Sometime after 2:30 a.m., Anthony told her that he, Butler, and Swafford were going to rob a motel and kill the night clerk by shoving a sharp object down his throat. Anthony showed her the key they were going to use to get into the motel. Before Anthony left she saw some walkie-talkies, and Anthony showed her a sharp object which looked like a nail file. However, she testified that the object was not the letter opener found in Bigler's body.

According to Greer, Anthony returned later and told her that he had been at Mixon's house. However, he was carrying some money, and Greer helped him count it. Greer also testified that at one time she considered herself engaged to Anthony and that she had previously lied to police and given alibi testimony for him.

Ramona Keil was a night clerk at the Mid-America Inn. She had been on duty during the two previous robberies at the motel. She stated that on May 31, 1992, a man entered that motel, asked for

a room, and then hit her on the head when she turned to look at the clock, and continued to hit her until she passed out. Eventually, she was thrown into the restroom, and she heard someone hitting the cash register keys. The person was unable to open the register, and nothing was taken.

Keil testified that on July 7 the front and back doors of the motel were locked. She was watching TV in a room next to the office when she heard glass break. When she went out into the lobby she saw the man from the first robbery, who proceeded to hit her with a black club. She was then kicked and thrown into the restroom. This time the assailant was able to open the cash register. Keil identified the defendant Swafford as the person who committed the crimes, although she had previously been unable to identify him.

Jennifer Harmon testified and admitted that she had been charged in the murder and robbery and had agreed to testify in exchange for the State's agreement to drop the murder charge. Harmon stated that she was 17 at the time of the murder and had known Anthony since she was 11 years old. She testified that Anthony had previously worked at the restaurant at the Mid-America Inn, which was owned by Harmon's grandparents. Harmon stated that she returned to Salina in 1991 after living in Topeka for some time, that she reestablished contact with Anthony, and that they began a sexual relationship in the winter of 1991. Harmon began working the 3-11 p.m. shift at the motel in April 1992.

After the first attempted robbery of the motel, Harmon went to Anthony's home and codefendant Swafford was there. As Swafford left, he asked Harmon "how the bitch was." Harmon testified that Anthony later told her that Swafford had gone into the motel and hit Ramona Keil on the head. Anthony stated that they had been unable to get into the cash register. Harmon told Anthony that the "room number" button had to be used to open the cash register.

Harmon stated that at one time she gave Anthony and Butler a ride to Junction City. On the trip, Anthony asked her to get him a copy of the keys to the motel. Butler also encouraged her to get the key for Anthony. Eventually, she agreed to leave the key where Anthony could pick it up and copy it.

Harmon stated that when she heard about the robbery and murder she suspected Anthony. She went to Anthony's house and found him sleeping; when she asked how he could sleep after what he had done, Anthony told her that he had "no conscience."

Detective Gerald Shaft of the Salina Police Department testified that as part of a drug sting operation the department had rented two apartments in a building in Salina. Shaft and another officer occupied one apartment, and Lamar Williams, a confidential informant, occupied the other. Williams' apartment was wired with videotape and sound so that the officers in the other apartment could monitor drug transactions.

Shaft testified that Lamar Williams told him he had talked to Anthony prior to the crime and that Anthony had asked him to participate in a robbery and murder at a motel. Shaft also testified that following the crime Anthony went to Williams' apartment to sell some drugs. In a conversation that was both videotaped and audiotaped, Anthony told Williams about the crime and demonstrated how the murder had been committed.

Shaft also testified that he had interviewed Anthony after Anthony's arrest. At first, Anthony denied any involvement. After being told of the existence of the tapes, Anthony became visibly upset, unable to believe that Williams was working for the police. When another officer asked Anthony why he would commit such a crime, Anthony stated, "Because it was peer pressure." According to Shaft, Anthony also stated, "I'm going to get the Hard 40 for this."

Lamar Williams then testified. Williams stated that during the time the crime was committed he was working on drug buys for the police and knew all three defendants. According to Williams, Anthony told him he was going to rob the motel, Swafford was going to knock out the clerk, and Anthony was going to slit the clerk's throat.

Williams testified that the night after the robbery and murder occurred, Anthony came to his apartment to sell drugs. While there, Anthony talked about the crime. Williams stated that Anthony had also talked about the previous robberies at the motel. Anthony had told Williams that he had a girl that would do anything for him and that the girl made him a key to the motel. Anthony

said that in the previous robberies, Swafford had gone into the motel and knocked out the clerk, Butler had been the lookout man outside, and Anthony had been the brains behind the operation.

Mike Marshall, a sergeant with the Salina Police Department, testified that he was in the upstairs apartment while Anthony was describing the crime to Williams in the downstairs apartment. He identified the videotape and audiotape as the tapes made that night. The videotape and audiotape were played for the jury. They are not a part of the record on appeal.

Kelly Robbins, a KBI forensics examiner, also testified on behalf of the State. She stated that she found blood on the seats of the Geo Metro owned by Anthony's mother. There was also blood present on a T-shirt, a sock, and a pair of sweatpants found at Anthony's residence. According to Robbins, the blood on the sweatpants was consistent with Bigler's blood and could not have come from either Anthony or Swafford.

Chad Johnson, a worker at Alco, also testified on behalf of the State. Johnson testified that during the summer of 1992 he had copied a key for Butler.

Anthony presented an alibi defense. James Anthony, Anthony's brother, testified that Anthony had stopped by at 3:00 a.m. on the night of the crime to deliver a shirt that James wanted to borrow. According to James, he gave Anthony a t-shirt with bloodstains on it to wear home.

After deliberation, the jury convicted Anthony of premeditated first-degree murder, aggravated robbery, sale of cocaine, and unlawful possession of a firearm.

## CHANGE OF VENUE

Anthony contends that the district court erred in denying his motion for change of venue because the pretrial publicity created so great a prejudice that he could not obtain a fair and impartial trial in Saline County. K.S.A. 22-2616(1) provides that the court shall, upon motion of the defendant, transfer the case to another county if it is satisfied that there is so great a prejudice against the defendant that he or she cannot obtain a fair and impartial trial.

The determination of whether to change venue is entrusted to the sound discretion of the trial court; its decision will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant. *State v. Lumbrera*, 252 Kan. 54, 57, 845 P.2d 609 (1992). The burden is on the defendant to show prejudice exists in the community, not as a matter of speculation, but as a demonstrable reality. The defendant must show that such prejudice exists in the community that it was reasonably certain he or she could not have obtained a fair trial. 252 Kan. at 57.

As a threshold question, the State claims that Anthony waived the change of venue issue by failing to renew the motion at the conclusion of jury selection. In support of this contention, the State cites *State v. Bierman*, 248 Kan. 80, 88, 805 P.2d 25 (1991), and *State v. Richard*, 235 Kan. 355, 365, 681 P.2d 612 (1984). Neither of these cases stand for the proposition that a defendant must renew the motion immediately following voir dire or see the objection waived. Rather, each of these cases notes that the defendants chose not to renew their requests at any time after the completion of voir dire, indicating that nothing new had arisen during voir dire that would show problems with finding an impartial jury. See *State v. Bierman*, 248 Kan. at 88; *State v. Richard*, 235 Kan. at 365. Anthony's attorney renewed his request for change of venue the next day. We find no merit in the State's argument that the motion for change of venue was waived.

Anthony argues that the nature of the pretrial publicity created overwhelming prejudice. It is true that the crime and the arrest of the defendants were highly publicized. It is also true that the Salina Journal published several stories which reported Anthony's past brushes with the law as well as his active nightlife. However, media publicity alone has never established prejudice per se. *State v. Grissom*, 251 Kan. 851, 927, 840 P.2d 1142 (1992). The burden is on the defendant to show that the publicity has reached the community to such a degree that it is impossible to get an impartial jury. 251 Kan. at 927.

Anthony presented a survey conducted by the Kansas State University Institute for Social and Behavioral Research in support of his motion. The survey consisted of an interview with 366 persons

in the Salina area. It revealed that 97.5% of those surveyed had heard about the case and the suspects, and 49% of those surveyed felt that the evidence was strong against all four suspects, 15.8% of those surveyed felt the evidence was strong against some defendants and weak against others, and of those persons, 95.9% felt the evidence was strong against Anthony. Thus, 63.8% of the total surveyed felt the evidence was strong against Anthony. Of those surveyed, 18% felt that they could not be impartial if asked to serve on a jury, 9.3% felt it was unlikely they could be impartial, 24.3% felt that it was likely that they could be impartial, 29.9% felt that it was very likely that they could be impartial, and 18.6% had no opinion.

There were motions made by all defendants regarding individual voir dire. However, the district court denied the motions and determined instead that problems could be avoided by summoning different panels at different times to prevent contamination of the jury pool at large. Six separate panels of prospective jurors were summoned and questioned by the court and counsel. In denying the motion for individual voir dire, the court offered to revisit the motion if a problem occurred when picking a jury.

The record reveals that each of the defendants' counsel asked questions regarding pretrial publicity, including whether the jurors had formed an opinion and, in the case of Anthony's attorney, whether that opinion was strong against one or all three defendants. Of the first panel of 18 jurors, 5 jurors indicated that pretrial publicity had led them to form an opinion, and they were dismissed for cause. The judge also asked questions of the jury regarding pretrial publicity at juror orientation. In the second panel, Swafford's attorney asked for a show of hands from those people who felt Swafford was guilty. The two persons who indicated they felt that he was guilty were dismissed for cause. All attorneys asked questions of the third panel concerning publicity. From the third panel, five persons said they had been affected by the pretrial publicity but only two of those five were asked to be stricken by the defense attorneys. Those two were stricken for cause.

On the fourth panel of 25 jurors, 12 felt that they knew a great deal about the case and had at least started to form their own

opinions. Of those 12, 10 were asked to be stricken for cause. Seven of those were stricken, but three who claimed that they would try to be impartial were left on. Both the judge and the attorneys asked questions about publicity. Of the fifth panel of 24, only 2 stated that they might have formed an opinion, and both stated that they could set that aside and be impartial. However, one was dismissed for cause. On the last panel of 25, only 2 expressed an opinion of the case, and they were dismissed for cause.

The court qualified 90 of the jurors for use on the jury panel. Each defendant then received 12 peremptory strikes, and the State received 36 strikes. The defense struck the three persons challenged for cause on the third panel that had not been stricken for cause.

On the whole, the court questioned only 125 jurors to arrive at a jury pool of 90. The record discloses that the attorneys had few, if any, problems in questioning jury members about the effects of publicity. All but three of the challenges for cause because of pretrial publicity were granted, and the remaining three challenged venirepersons were taken off by peremptory strikes. The whole selection process lasted two days. Although jury selection was drawn out due to the district court's precautions, it was not inordinately difficult to pass a pool of jurors for cause. No objections were made about the process following the selection.

We hold that the court did not abuse its discretion in denying Anthony's motion for change of venue. In concluding our discussion of this contention, the following quote from *State v. Ruebke,* 240 Kan. 493, 500-01, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987) is appropriate:

"Media publicity alone has never established prejudice per se. The trial court had no difficulty in finding from the jury panel jurors who stated that they could render a fair and impartial verdict. The small number of jurors dismissed by the court for cause and the effort of the judge to press no one into jury service who showed the slightest hint of prejudice established that there was no abuse of discretion in denying a change of venue. Unless we are to assume that (1) the jurors selected to try the defendant violated their oath when they swore that they could give the defendant a fair trial or (2) an individual can commit a crime so heinous that news coverage generated by that act will not allow the perpetrator to be brought to trial, the defendant has not established substantial prejudice.

There was no abuse of discretion on the part of the court in denying the defendant's motion for change of venue."

## SEVERANCE OF CHARGES

Anthony contends the court erred in denying his motion for severance of the sale of cocaine and unlawful possession of a firearm counts from the rest of the counts relating to the robbery and murder. Whether a defendant will be tried on separate charges in a single trial is a matter within the discretion of the trial court and will not be disturbed absent an abuse of that discretion. *State v. Cromwell*, 253 Kan. 495, 511, 856 P.2d 1299 (1993). If reasonable persons could differ about the propriety of the trial court's decision, this court will not find an abuse of discretion.

K.S.A. 22-3202(1) governs and provides:

"Two or more crimes may be charged against a defendant in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

Anthony correctly argues that neither the sale of cocaine nor the unlawful possession of a firearm are of the same character as the robbery and murder charges. However, joinder may be proper under K.S.A. 22-3203(1) if the charges sought to be joined together with the ones already charged are based on two or more transactions *connected together* or constituting parts of a common scheme or plan. The sale of cocaine charge in this case is based upon what occurred when Anthony went to Lamar Williams' apartment to sell cocaine. At the time, Anthony was selling cocaine to Lamar Williams, the police were taping Anthony's statement which provided direct evidence of his involvement in the robbery and murder at the motel. Similarly, the unlawful possession of a firearm charge resulted from a search of Anthony's car to uncover more evidence of the robbery and murder.

While the robbery and murder are separate and distinct charges from the sale of cocaine and unlawful possession of a firearm charges, all the charges are *connected together*. It would be very

difficult to introduce evidence of the defendant's incriminating statement regarding the robbery and murder without establishing the context within which the defendant's statement was made. The statement was being taped because this was an undercover drug operation by the police, and the statement was made while Anthony was selling cocaine to the police undercover informant. Similarly, although somewhat differently, the gun was discovered during a search seeking evidence of the murder and robbery. The connection between the selling of cocaine and possession of the weapon on the one hand and the motel murder and robbery on the other hand is real and substantial enough to allow joinder. At the very least, we believe that reasonable persons could disagree on the ruling of the trial court, and we do not, therefore, find an abuse of discretion in granting joinder.

## SEPARATE TRIALS

Anthony also contends that the district court erred in denying his motion for severance of defendants. Severance lies within the sound discretion of the trial court. The burden is on the movant to present sufficient grounds to establish actual prejudice. *State v. Hunter*, 241 Kan. 629, 633, 740 P.2d 559 (1987).

K.S.A. 22-3202(3) governs the disposition of defendant's contention and provides that two or more defendants may be charged in the same complaint, information, or indictment if they are alleged to have participated in the same act or series of acts constituting the crime or crimes. Two or more defendants may be later joined for trial if the defendants could have been charged in the same complaint, information, or indictment. *State v. Hunter*, 241 Kan. at 632-33.

Anthony argues that the primary defenses of Butler and Swafford were to blame him for the crimes and that severance of the defendants was necessary to preserve his right to a fair trial. Because both Butler and Swafford made Anthony out to be a liar and pointed to Anthony as the person who committed the crimes, their defenses were antagonistic. Antagonistic defenses, the defendant argues, require severance.

Antagonistic defenses do require severance, but such defenses occur only when each defendant is attempting to convict the other. *State v. Pham*, 234 Kan. 649, 655, 675 P.2d 848 (1984). The existence of antagonistic defenses among codefendants is cause for severance when the defenses conflict to the point of being irreconcilable and mutually exclusive. *State v. Martin*, 234 Kan. 548, Syl. ¶ 3, 673 P.2d 104 (1984). In this case, the defenses of Anthony, Swafford, and Butler are not antagonistic. All three relied on alibi defenses that were not mutually inconsistent. The only argument Anthony makes is that Butler and Swafford accused him of being a liar. However, the record demonstrates that Butler and Swafford made this accusation in order to refute taped evidence of Anthony implicating them along with himself in the crime. Simply because Butler and Swafford both maintained that Anthony was lying when he claimed they were with him in the commission of the crime does not lead to the conclusion that Anthony committed the crime. Anthony fails to establish prejudice from the failure to sever. We conclude that the district court did not abuse its discretion.

## CONTINUANCE AND MOTION TO RETAIN COUNSEL

Anthony contends that the trial court denied him his right to retain chosen counsel by failing to grant a continuance so that his retained counsel could prepare for the case. Anthony argues that the court should have granted him a continuance because he had no confidence in his appointed counsel and was not seeking to purposely delay the proceedings.

The trial court did not refuse to admit Anthony's retained counsel. The court instead refused to grant a continuance for the sole purpose of admitting the retained counsel. The granting of a continuance in a criminal case is within the discretion of the trial court, and its ruling will not be disturbed unless such discretion has been abused and the substantial rights of the defendant have been prejudiced. *State v. Dunn*, 243 Kan. 414, 427, 758 P.2d 718 (1988).

An essential element of the Sixth Amendment's protection of the right to counsel is that a defendant must be afforded a reasonable opportunity to secure counsel of his or her choosing. *Powell v. Alabama*, 287 U.S. 45, 53, 77 L. Ed. 158, 53 S. Ct. 55 (1932).

However, although an accused must be provided a fair opportunity to obtain counsel of his or her choice, this right cannot be manipulated to impede the efficient administration of justice. *State v. Bentley*, 218 Kan. 694, 695, 545 P.2d 183 (1976).

In *U.S. v. Kelm*, 827 F.2d 1319, 1322 (9th Cir. 1987), the 9th Circuit Court of Appeals stated: "When a criminal defendant's constitutional right to secure counsel of his choice conflicts with the trial judge's discretionary power to deny continuances, the reviewing court must balance several factors in determining whether the trial court's conduct was 'fair and reasonable.'" The court notes that these factors include: (1) whether a continuance would inconvenience witnesses, the court, counsel, or the parties; (2) whether other continuances have been granted; (3) whether legitimate reasons exist for the delay; (4) whether the delay is the fault of the defendant; and (5) whether denial of a continuance would prejudice the defendant. 827 F.2d at 1322 n.2.

In this case, Charles Atwell, the attorney Anthony sought to retain, told the court that he could not enter an appearance in the case without first securing a continuance. This motion came on January 27, 1993, 18 days before the trial was scheduled to begin, and the case had been pending for 6 months. Atwell explained that funds had not been available to retain him until the first of the year and that due to the serious nature of the case he would not be able to competently represent Anthony on February 16. He stated that in order to fully prepare for the case he would need a continuance of approximately two months. Anthony had already asked for and received one continuance. Of the codefendants, Butler opposed the motion, and Swafford made no comment. However, Butler's refusal to waive his right to a speedy trial would have resulted in a severance of the cases if a continuance had been granted.

Based on these circumstances, the district court did not abuse its discretion in failing to grant a continuance where the only reason for the continuance was to allow new counsel to enter his appearance. In reaching this decision, it should be stressed that the district court made no attempt to restrain Atwell from entering the case

as Anthony's attorney but only stated that it would not grant a two month continuance for that express purpose.

## DUPLICITOUS CHARGE

Anthony contends that the charge of unlawful possession of a firearm was duplicitous in that it charged two separate and distinct offenses in a single count. He argues it was unclear whether the State was charging him with possession of the firearm found in his car, the firearm found in the woods near the motel, or the firearm later found in his room.

A complaint which charges two separate and distinct offenses in a single count is duplicitous. *State v. Anthony*, 242 Kan. 493, 497, 749 P.2d 37 (1988). Duplicitous charging is bad practice because it confuses the defendant as to how he or she must prepare a defense, and it confuses the jury. 242 Kan. at 497. The problem with duplicity is that jurors are unable to convict of one offense and acquit of another offense when both are contained in the same count. *State v. Campbell*, 217 Kan. 756, 778, 539 P.2d 329, *cert. denied* 423 U.S. 1017 (1975).

The complaint in this case is not duplicitous. It charges one distinct count, that of unlawful possession of a firearm, even though there are three possible firearms which the jury could have found that Anthony possessed. Duplicity is the joinder of two or more separate and distinct offenses in the same count, not the charging of a single offense involving a multiplicity of ways and means of action and procedure. *State v. Campbell*, 217 Kan. at 778. In this case, the information states Anthony was in unlawful possession of a firearm on August 10 and 11, charging him with one crime.

## HEARSAY

Finally, Anthony contends that the district court erred in admitting certain statements made by the victim, Oliver Bigler, to Dr. Clark, Bigler's physician, prior to the robbery and murder. Anthony argues that this hearsay testimony was irrelevant to the question of guilt or innocence and served only to prejudice the jury.

The exchange of which Anthony complains occurred when Dr. Clark was testifying about Bigler's health. The State asked if Bigler

had ever mentioned what he would do if a robbery occurred in the motel where he was working. Anthony's attorney objected to the question. The State told the court that it was offering the testimony to show Bigler's state of mind and to corroborate evidence of the defensive wounds suffered by Bigler, both of which would go to the issue of premeditation. The court stated that it would overrule the objection as long as the testimony went to the victim's general state of mind. Clark was then allowed to testify that Bigler told him he would give the robbers anything they wanted and would not resist.

The State contends that the statements were admissible under K.S.A. 60-460(d)(3). This exception to the hearsay rule states that in cases where the declarant is unavailable as a witness, statements made by the declarant at a time when the matter had been recently perceived by the declarant, while the declarant's recollection was clear and made in good faith prior to the commencement of the action and with no incentive to falsify or distort, are admissible. K.S.A. 60-460(d)(3).

The problem with this argument is that the district court did not specifically make the findings mandated in K.S.A. 60-460(d)(3). Nevertheless, it is apparent that the testimony could have been admitted under K.S.A. 60-460(d)(3) because it was a general question as to what Bigler would do in the event of a robbery, made soon after a robbery had taken place, and obviously made before the robbery and murder of Bigler. In *State v. Garner*, 237 Kan. 227, 242, 699 P.2d 468 (1985), the victim's prior statement that he would not sell his cattle was held to be admissible under K.S.A. 60-460(d)(3) in order to show the defendant's story that the victim had sold cattle to him was false. The situation is the same in this instance, even though the district court did not explicitly state it was admitting the evidence under K.S.A. 60-460(d)(3). "[W]here the trial court reaches the correct result based upon the wrong reason, this court will affirm the trial court." *State v. Shehan*, 242 Kan. 127, 131, 744 P.2d 824 (1987).

Anthony also makes an assertion that the evidence contained in the hearsay statements was irrelevant to guilt and served only to prejudice the jury and could be considered a "victim impact state-

ment." However, the evidence was clearly relevant to the issue of premeditation, especially in light of other evidence adduced at trial which tended to show that Bigler was killed because he refused to cooperate with the robbers. Therefore, we conclude that the district court did not err in admitting the evidence.

Affirmed.