No. 84,969

STATE OF KANSAS, *Appellee*, v. MIKEL J. DREILING, *Appellant*.
(54 P.3d 475)

 

 Opinion filed
September 27, 2002. 

*Virginia A. Girard-Brady*, of Lawrence, argued the cause and was on the briefs for appellant.

*Chris E. Biggs*, county attorney, argued the cause, and *Robin Graham*, assistant county attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

*Per Curiam*: Mikel Dreiling appeals his jury convictions of first-degree premeditated murder, conspiracy to commit first-degree murder, conspiracy to commit perjury, and terroristic threat. Mikel raises the following issues: (1) The State presented insufficient evidence to sustain its burden of proof, (2) the trial court erred in finding that materiality was an element of the perjury charge, (3) the trial court erred in admitting evidence of prior bad acts, (4) the trial court erred in refusing to sever the conspiracy to commit perjury charge from the murder charges, (5) the trial court violated his First Amendment rights, and (6) cumulative error denied him a fair trial.

This appeal follows the jury convictions in a joint trial of Mikel Dreiling and his sister, Dana Flynn, for the December 22, 1992, death of Randy Sheridan. The jury convicted Dana of first-degree premeditated murder, conspiracy to commit first-degree murder, and conspiracy to commit perjury. The State's theory was that Dana and Mikel killed Randy in order to settle a custody dispute over Dana and Randy's daughter, A.S.

## Facts

### History leading to the death of Randy Sheridan

Randy Sheridan's body was discovered in Geary County approximately 1 mile from his home shortly after 3 p.m. on December 22, 1992. He had been shot several times with what appeared to be a 12-gauge shotgun. His death was caused by two shotgun wounds to the head. Evidence indicated he had been shot from a

vehicle and then shot at point-blank range while lying face up by the side of the road.

### Randy's affair with Dana and the birth of A.S.: 1981-1987

Judith and Randy Sheridan were married April 11, 1981, and settled into a house near Junction City. The relationship was at times troubled, and Randy moved to Chapman without Judith within 1 year of the marriage.

While in Chapman, Randy had a relationship with Dana, and Dana gave birth to a daughter, A.S., on August 27, 1985. Dana filed a paternity action against Randy. Randy admitted paternity and was ordered to pay child support, to pay one-half of A.S.'s medical bills, and to obtain an insurance policy naming A.S. as beneficiary. He was granted reasonable visitation rights and visitation every other weekend.

Randy moved back into the house with Judith within 1 to 2 years after first moving out. When Judith learned that Dana had filed a paternity suit against Randy, Judith and Randy divorced, and Randy moved back to Chapman. Eventually, Randy and Judith reconciled their differences and Randy moved back with Judith, but they never remarried. The couple had their own daughter, S.S., in January 1989. Judith testified Randy was a good father.

In 1986, Randy sought and secured joint custody of A.S. Problems with visitation later surfaced as Dana and Randy began to disagree over various issues concerning A.S.'s upbringing.

Dana, who disapproved of Randy's lifestyle, also believed Randy was trying to turn A.S. away from Dana's church. According to one witness, Dana said she would "do anything to keep from having [A.S.] go back out there or see Randy."

### Dana's relationship with Steve Flynn and the birth of J.F.: 1987-1992

Steve Flynn and Dana were married in November 1987 and moved to Salina after their marriage.

In May 1988, Steve and Dana began attending the Fountain of Life Church where Jerry Rollins was the pastor. Witnesses described the church as a Pentecostal church. Numerous witnesses

testified that members of Pastor Rollins' church, including Pastor Rollins, would speak in tongues, which was described at trial as unintelligible vocalizations. The witnesses further testified that Pastor Rollins proclaimed to have the "gift of prophecy" and that he was "God's prophet during these later days" and that members of the Fountain of Life Church believed in prophesy. Witnesses also stated that Pastor Rollins regularly made prophesies during church services, stating that he was quoting what God was supposedly telling him; the witnesses stated that Pastor Rollins believed Salina was the most evil town in Kansas and that Kansas was the most evil state in the United States.

During the fall of 1988, Pastor Rollins prophesied that Randy was evil and Steve was, in God's eyes, A.S.'s father. Pastor Rollins further prophesied that it was not God's will that Randy have visitation with A.S. and that God would take care of Randy.

Some of the church's services were held at Pastor Rollins' house. The church membership also included Dana and Mikel's father Norman, their mother Shirley, and a number of siblings.

After moving to Salina, Dana tried to change Randy's visitation rights. The change was precipitated, in part, by Dana's belief that the distance between Salina and Randy's home in Junction City necessitated the change.

After a few months of attending Pastor Rollins' church, Steve and Dana's marital relationship began to change. Pastor Rollins and Dana began spending increasing amounts of time together and telephoned each other frequently. They spent time at each other's homes. During this time, Pastor Rollins began to offer Dana and Steve marriage counseling. J.F., Steve and Dana's son, was born in January 1989. Steve and Dana divorced in June of that year.

### *Evidence that Dana referred to Steve as the devil: February 1992*

J.F. began to call Steve various names. Steve described for the jury what he heard when he picked up J.F. on February 22, 1992:

"He said—basically, yelled, 'Nanny nanny boo boo, you serve the devil. Nanny nanny boo boo, you serve the devil,' over and over and over for about ten miles, as we drove down Interstate 70 from Salina. 'Nanny nanny boo boo, you serve the devil,' over and over."

During the summer of 1992, J.F. said to his father, "Daddy serves the devil," in an angry manner. J.F. also said, "Grandma serves the devil." J.F. also told Steve that he had a new "daddy," which Steve took to be a reference to Pastor Rollins. Another time, J.F. said, "Hi, you old faggot," to his father. Steve believed Dana was teaching J.F. to make these comments and, as a result, contacted the Kansas Department of Social and Rehabilitation Services (SRS) to initiate an investigation.

On a later occasion when Steve picked up J.F., J.F. made a motion as if he was "zipping his lips." Steve explained:

"I asked him what he was doing, and he blurted out that I served the devil and that I was going to go to hell, and he started crying, and he—then he said he wanted to go back to his mom's house.

"He opens the door, I reach out, grab the door, right before he jumps out, I then get out my door and run around and catch him, as he's running for his mother's house. I catch up with him on the porch, I grab him, put him in my arms.

"I knock on the door, Dana comes to the door, and I yell at her. I say, 'You told him that I serve the devil and it's bullshit.' And that—I take him out to the truck, she yells out after him, 'Don't listen to him [J.F]. Don't listen to him.' And I strap him in and hold him down and take him home."

### *Dana's first sexual abuse allegation: 1989*

In July 1989, Randy was contacted by Detective Albert Buskey from the Geary County sheriff's department concerning allegations that Randy was sexually molesting A.S. During this time, Randy and Dana were having significant disagreements over the visitation and raising of their daughter.

The sexual molestation allegations provided Dana an excuse for denying Randy visitation of A.S. Randy's attorney advised Randy to begin documenting the events.

Judy Pearce, a social worker with SRS, testified that Dana told her during June 1989 that A.S. had been sexually abused. Pearce interviewed A.S. Following an investigation, SRS sent a notice to Randy that the allegation was unfounded. At the same time, SRS sent a similar notice to Dana. However, Dana's notice also indicated SRS was concerned that A.S. had been coached to substan-

tiate the sexual abuse allegations. The SRS notice stressed how "extremely emotionally damaging" such coaching can be.

### *Dana's second sexual abuse allegation; Randy and Steve ally against Dana: May 1992*

A.S. and Randy had a good relationship through the beginning of 1991. Slowly things began to change. A.S. was standoffish on Friday nights when Randy picked her up, but would be friendlier by the next morning. During May 1992, Dana made additional allegations that Randy was molesting A.S., and Dana refused to allow Randy visitation. Randy would not again have any visitations with A.S. until July 1992. When visitations continued, Randy could only have SRS supervised visitation with A.S.

During March or April 1992, Randy contacted Steve to inquire whether Steve had been having similar problems with Dana. Steve and Randy began to share information regarding their mutual problems with Dana.

### *Marriage between Lee Anna Rollins and Pastor Rollins: 1979-1992*

Pastor Rollins' wife from 1979 to 1992, Lee Anna Miller, found an invoice from an adult mail-order company, Adam and Eve, in 1990. The invoice indicated the adult items had been sold to Pastor Rollins and sent to Dana's house. Lee Anna made copies of the invoice and confronted Pastor Rollins. At the confrontation, Pastor Rollins and Lee Anna "wrestled over it," and Pastor Rollins got the copy away from Lee Anna.

Lee Anna believed Pastor Rollins was having an affair with Dana. Nevertheless, Dana moved in with Pastor Rollins and Lee Anna. Dana told her coworkers she was engaged but would not say to whom. Lee Anna moved out of the house in February 1992 and stopped going to the Fountain of Life Church. She gave her divorce attorney a copy of the invoice from the adult mail-order company and also gave a copy to Steve.

As a result of the cooperation between Steve and Randy, Randy obtained a copy of the invoice. Randy had a friend write "Praise the Lord" on the invoice and had several copies sent to Dana's

family. A copy of the invoice with "Praise the Lord" written on it was found in Pastor Rollins' house following Randy's murder.

### Pastor Rollins' shotgun

Lee Anna's brother, a hunter, sold a shotgun to Pastor Rollins. Lee Anna remembered Pastor Rollins kept the shotgun in his closet, and she remembered the shotgun was there when she moved out in February 1992.

### Randy hires attorney Robert Pottroff: August 1992

Randy hired another attorney, Robert Pottroff, who began to aggressively approach the custody battle involving A.S. Randy was concerned about the welfare of A.S. and felt A.S. was being brainwashed. Randy wanted a custody evaluation, and Pottroff secured this for his client.

During a November 3, 1992, deposition of Dana, Pottroff asked Dana about her relationship with Pastor Rollins. Pottroff testified at trial: "She said, 'Just friends. He is a minister and I was someone who went to the church.'" Dana said she did not see Pastor Rollins often and denied that Pastor Rollins was her marriage counselor. She denied having lived with Pastor Rollins and denied that A.S. had lived in the same household as Pastor Rollins. Dana further denied that Pastor Rollins had packages mailed to her.

Randy was evaluated by Dr. Gail Roth as ordered by the court. Dr. Roth testified he was aware of the sexual abuse allegations against Randy. The prosecutor asked Dr. Roth what he thought of the sexual abuse allegations: "I had looked through them, and what I was concerned about is whether the reports were founded or unfounded. The information that I had suggested unfounded, and so I was not going to pursue that further. I was not going to investigate that." Dr. Roth did not have any concerns over Randy's parenting ability.

Dana did not complete the required evaluation. At first, she failed to contact the psychologist as ordered. Dana did not begin the court-ordered psychological testing until December 17, 1992. Dr. Roth testified the evaluation process ended after the death of Randy.

Based on the deposition testimony, Pottroff filed a motion on November 24, 1992, to compel an "immediate custody evaluation" and a motion to modify the custody arrangement. Pottroff alleged, in part, the following:

"2. On July 30, 1992, this court ordered an immediate psychological/custody evaluation. The court also allowed defendant supervised visitation, and his parents visitation rights. Dana Flynn has refused any grandparent visitation, despite the fact that there's never been any allegations of impropriety between the paternal grandparents and the minor child, [A.S.].

"3. Dana Flynn has circumvented the supervised visitation of Randy Sheridan by failing to appear for prearranged visitation with SRS.

"4. Dana Flynn has totally circumvented the evaluation process by refusing to agree upon an evaluator. After she was forced to agree upon an evaluator under threat of further litigation, she then refused to meet with the evaluator that was appointed by agreement of the parties.

"5. The agreed evaluator, Central Kansas Mental Health Center, Salina, Kansas, finally contacted the court and counsel concerning their being totally frustrated by Dana Flynn's failure to cooperate with the evaluation process.

"6. It appears that Dana Flynn's refusal to engage in the psychological/custody evaluation is part of her overall plan to totally avoid compliance with the court's orders.

"7. Defendant has evidence that Dana Flynn is currently involved in a relationship with Jerry Rollins. That relationship and all information about Jerry Rollins has been intentionally concealed by Dana Flynn. The concealment is obviously intended to circumvent the court's consideration of relevant factors as specified in K.S.A. 60-1610(a)(3)(B)(i), which directs the court to consider 'the length of time that the child has been under the actual care and control of any person other than a parent and the circumstances relating thereto.'

"8. Jerry Rollins has exercised long term, continuous control over Dana Flynn, her family, and, in particular, [A.S.]. That control has been psychologically and emotionally destructive to [A.S.]."

Pottroff asked for a number of orders in the motions, including that all adults "with any significant impact on [A.S.]" get a full psychological evaluation. A hearing on the motions was set for December 8, 1992, but the hearing did not take place. Over Pottroff's objection, Dana was able, the day before the hearing, to secure a continuance. Pottroff testified the continuance was a delay tactic on Dana's part. The hearing was continued until December 21, 1992.

As a result of the court-ordered continuance, Pottroff filed a temporary order for custody/visitation and a restraining order. The order removed the requirement that Randy's visits with A.S. be supervised. Randy was granted visits every weekend and visitation from December 29, 1992, through January 3, 1993, to accommodate an annual ski trip. A.S. was ordered to have no contact with Pastor Rollins. With regard to this last provision, Pottroff testified regarding the predicament into which this forced Dana:

"I—I asked the judge to issue a restraining order which would prevent [A.S.] from coming in contact with Jerry Rollins. There was an objection by Larry Livengood that he thought that was unnecessary order, because we were just taking somebody out of this child's life, at which point I related to the judge, 'Well, Judge, I've got the depositions of these two people, and they claim there is no relationship with Jerry Rollins and [A.S.], so humor me, just go ahead and make it a court order that they can't see each other, because if they're telling you the truth in the depositions and they're not seeing her, it shouldn't hurt anybody for them to not see her for the next few weeks.' That was very hard for the judge to listen to an argument on the other side, and he gave us the restraining order."

Randy's next visitation was scheduled for December 11, 1992, but A.S. refused to leave Dana's house. Pottroff filed a motion for citation of contempt and modification of custody arrangement, and the hearing was set for December 21, 1992. Pottroff filed the motion for contempt because of evidence from Pastor Rollins' neighbors that Dana allowed A.S. to have contact with Pastor Rollins the day after the court's order restraining such contact.

### Threat to Steve: December 7, 1992

Steve, in his divorce case with Dana, made a number of allegations: (1) Dana had physically abused J.F., (2) Dana was having a relationship with Pastor Rollins and resided with Pastor Rollins, (3) Dana was accusing him of being a homosexual and told that to J.F., (4) Pastor Rollins exercised such control over J.F. that it interfered with Steve's relationship with J.F., (5) Dana continually "persists in telling [J.F.] that [Steve] serve[s] the devil," and (6) Dana had refused to get counseling. Steve requested that (1) all adults involved in J.F.'s life be evaluated, (2) J.F. be evaluated "to help determine the full extent of his emotional problems," (3) Steve be

granted full custody of J.F., and that (4) Dana only have supervised visitation with J.F.

Steve first saw signs of physical abuse of J.F. in November 1992, when he noticed a bruise on J.F.'s bottom and took J.F. to the hospital to document the bruise. On the way home from the hospital, J.F. called Steve "a queer." When Steve returned J.F. to Dana, he informed her that he had taken J.F. to the emergency room and called the police, and that J.F. had called him a queer. Dana replied, "Thanks, Mr. Homosexual."

Steve took J.F. to see a counselor, Vanessa Fechter, a mental health therapist, on December 4, 1992. Based on the information provided by Fechter, Steve decided not to return J.F. to Dana. J.F. drew a picture of the devil and showed it to Fechter and also said his father was the devil. Fechter testified J.F. was very talkative when she first began meeting with J.F., but later J.F. became reserved. Fechter asked J.F. about Pastor Rollins, and J.F. replied, "He does not exist." Fechter believed it was strange for a 3-year-old to use those words.

On December 7, 1992, the day Steve filed his motion to modify custody, he was scheduled to return J.F. to Dana but instead went to Dana's front door, told her he was not returning J.F., and then went to work. Approximately 2 hours later, Dana and Mikel went to Steve's place of work. Dana and Mikel got out of their car and approached Steve. Mikel immediately began yelling, accusing Steve of having kidnapped J.F. Steve described what happened:

"Well, when he got up to me, he started—started poking. He didn't touch me, but he was like this, right in front of me, again, saying, 'Going to see you go down. I'm going to make—I'm going to make you go down. I'm going to see you go down,' repeating that over and over.

. . . .

". . . It was at that time Dana grabbed Mike's arm and said, '*Mike, now's not the time. Mike, now's not the time*,' as he kept saying to me, 'I'm going to see you go down. I'm going to take—make you go down,' and it was after she grabbed his arm, he turned and spit a luggie right here on my cheek . . . ." (Emphasis added.)

Steve returned J.F. to Dana later that afternoon. Steve testified that as a result of his motion, he was later granted custody of J.F. and that he had maintained custody since.

*Threat to Randy: December 12, 1992*

Judith and Randy received two telephone calls during the early hours of December 12, 1992. The calls came between 3:30 and 4:30 a.m. Records from the telephone company indicated the calls originated from Mikel's residence. Judith did not hear anything after answering the first call. When Judith answered the phone the second time, Judith heard the words "die" or "dead." Randy took the phone from Judith, listened, and said, "Why don't you grow up, Mikey?" Randy used "Mikey" to refer to Mikel.

After the murder, KBI agent Jeffrey Brandau interviewed Judith regarding the telephone death threat. Judith specified, without looking at any phone records, the date of the telephone call and the identity of the caller.

*Failure of Dana's sexual abuse allegations becomes apparent: December 15, 1992*

Social worker Pearce spoke with Dana's attorney, Larry Livengood, and advised him she found "elements . . . missing" from the allegations that Randy abused A.S. Further, Pearce testified she told Livengood that she actually suspected Dana of a different type of abuse:

"Q. And what, if anything, did you advise her attorney on the 15th of December of 1992?

"A. I clarified my role, that it was my job to investigate the sexual abuse, and that—advised him the various elements was [sic] missing, so we couldn't confirm the sexual abuse, but that we did have some concerns about emotional abuse, and that if there is subsequent documentation by a therapist that she had been abused, there could be repercussions in terms of removal [of A.S.] from Dana's home through the juvenile court system.

"Q. And were you—when you were referring to abuse at that point being looked at by a doctor, what kind of abuse are you referring to?

"A. Emotional abuse.

"Q. And what, specifically, were you referring to?

"A. The trauma that [A.S.] was exhibiting, because of being torn between the two parents, and the fear that she was exhibiting of her father."

Later, Pearce spoke with Livengood and told her that Dana doubted her objectivity.

*Trip to visit Dr. Edelman: December 18, 1992*

On December 18, 1992, Randy met A.S. to begin his visitation. A.S. was quiet at first. Later that evening, Randy and Judith drove to Manhattan with A.S. to visit with Dr. Sheldon Edelman, a clinical psychologist. Dr. Edelman described A.S.'s behavior:

"Well, she was screaming. She had been—apparently, been screaming all the way from Salina to my office. Her voice was hoarse, at times, she was weeping inconsolably, and she was directing her rage at her father. She was saying that he was sent by the devil, that he was evil, and that she wanted to be with her mother."

When Judith and Randy returned the next day with A.S., A.S. was much calmer, acting like a normal child.

*Evidence Dana received warning in custody battle: December 20, 1992*

James Canfield, the ex-husband of Dana's sister Cheryl, met with Pottroff on December 20, 1992, to discuss testimony relating to the custody battle between Dana and Randy. Canfield later had a conversation with Cheryl during which he told Cheryl that Dana was going to lose her children and that Dana was in for a "rude awakening on it."

*Dana delays contempt hearing: December 21, 1992—day before the murder*

Pottroff testified that the December 21, 1992, hearing on his motion for contempt did not take place. Livengood called Pottroff on the morning of December 21, 1992, and said he and his client did not want to go to court. Pottroff told Livengood he was impatient with Dana and her delaying tactics and that he was not going to back off of the contempt citation. Pottroff was willing to negotiate on a number of other matters. In terms of custody, Pottroff secured a number of concessions, including giving Randy custody of A.S. from December 22, 1992, until the Saturday after Christmas for the annual ski trip and equal custody thereafter. Further, Pottroff again reiterated the requirement that A.S. have no contact with Pastor Rollins. Pottroff demanded that Dana get an evaluation. Pottroff and Livengood agreed to work out the details of when Randy would pick up A.S. for the ski trip the next morning.

Despite the continuance, Pottroff went to court to make a record of evidence supporting the motion for contempt. Livengood and Dana did not appear at the hearing. Pottroff took the testimony of Pastor Rollins' neighbors before the court reporter. Pottroff also hired a court reporter to take the testimony of Lee Anna Miller, Pastor Rollins' ex-wife.

### Randy's actions prior to the murder: December 22, 1992

On December 22, 1992, the day of his murder, Randy was waiting to hear from Pottroff regarding the details of when A.S. could be picked up for the ski vacation. Randy called Judith between 2:30 and 3 p.m. and said he had not heard anything from Pottroff. Randy told Judith he was going running and that he would call her again at 3:30 p.m.

That same day, Pottroff still had to negotiate a date and time for Randy to pick up A.S. Randy woke Pottroff's secretary at 6:30 a.m. to inquire about the details. Pottroff tried to call Dana's attorney at 9 a.m., but no one was in Livengood's office at that time. Pottroff was not able to get the details worked out that morning. Pottroff spoke with Livengood around noon. Pottroff became frustrated that Livengood was having difficulty talking with his client. Pottroff recalled having told Livengood during that noon conversation that Randy had taken the afternoon off and was home waiting to hear when A.S. could be picked up.

Randy called Pottroff at 2:06 p.m. to inquire again. Randy left a message that he was going to go running and would call back when he finished. Pottroff was not able to work out the details that afternoon, and he wanted to speak with Randy before demanding the pickup of A.S. at 10 a.m. the next day. Pottroff testified there was, in retrospect, something odd about the negotiations that day with Livengood:

"We had—every time we dealt with the custody and visitation issues in this case, we had set a time, we had set a date, we would set who's present, we had set where it's going to be, the details just flowed, and in this situation we were getting to the point where my client was going to go pick up this little girl to begin half custody and there was—seemed to be no concern about when that happened, when it stopped. Nobody wanted to even discuss the details of this with me, when

that had been something that we just got bogged down in every other conversation.

 . . . .

 "The two things that just struck me that came down real hard is that I had told where Randy was that afternoon and that there appeared to be no plans in place, at all, for the return of this child, pick up of this child, which to me, had I seen it in advance, I would know that nobody was really expecting for him to get the child anyway."

## The crime scene

Randy's body was found shortly after 3 p.m. on December 22, 1992, lying on the side of a dirt and gravel road near his house. There were no shells located near the body. Randy was wearing a black running suit. Randy's body was still warm at 3:30 p.m. The blood was only "very slightly" coagulated. There was little, if any, blood splattered next to the body on the road side. The minimal amount of blood splatter on the road side of the body indicated that the shooter likewise escaped the incident with few bloodstains. The center of the road was dry but the edges were damp.

The murder weapon was consistent with a 12-gauge shotgun. No murder weapon was found. No shotgun shells were found. Kansas Bureau of Investigation (KBI) Special Agent Brandau testified there was no need for a crime van at the scene because there was no physical evidence to collect. Agent Brandau testified there was no evidence of a struggle at the scene.

## Examination of the body

Dr. Wike Scamman, a pathologist, performed an autopsy the day Randy's body was found. Dr. Scamman testified Randy had been shot 5 times, hitting: (1) the right wrist and chest, (2) the left side of his chest and back, (3) the neck, (4) the head a first time, and (5) the head a second time. Dr. Scamman testified that the "wounds to the chest and forearm would have come before the . . . wounds to the head and neck." One of the head wounds was a contact wound, and the other, while close, was not a contact wound. The shotgun that caused the noncontact wound was within 6 inches of Randy's head when it was fired. Dr. Scamman testified

the contact head wound occurred before the noncontact head wound.

Dr. Scamman also testified that the wound to Randy's wrist and chest, while making pellet tracks to the heart and lung, would not have even caused Randy to fall. Dr. Scamman estimated the shotgun would have been 4 feet above the ground—consistent with having been fired from a car window. Regarding the wrist wound, Dr. Scamman testified the range from the gun to Randy's body was 10 feet or less. The shot to the side of the chest and back would have caused Randy to fall, but was not immediately fatal. The shot to the neck, which caused damage to the right vertebra and disruption of the spinal cord, would finally have caused a loss of consciousness. Regarding the neck wound, Dr. Scamman testified the range from the gun to the body was less than 10 feet. The contact wound to the head would have caused the hole in Randy's forehead. This hole provided an outlet for expanding gasses following the second shot to decrease the amount of blood splatter. The wounds to the neck and head would have occurred while the victim was on the ground.

Dr. Scamman concluded by saying the death was "a result of the shotgun wounds to the head."

## Investigation immediately following the murder

Agent Brandau spoke with Judith Sheridan at 5:15 p.m. the day of Randy's murder. Judith immediately consented to a search of her house. Upon entering the house, Agent Brandau noticed two blue folders on the dining room table and two envelopes on the kitchen counter. The folders and envelopes contained documentation associated with Randy's custody battle with Dana. Agent Brandau found no indication there had been a crime committed at Randy's house. While Agent Brandau was at the Sheridan house, Dr. Edelman, the Manhattan psychologist, called. Agent Brandau had a conversation with Dr. Edelman, who provided some explanation of the custody problems Randy had been having with Dana.

Based on the papers Agent Brandau found at the Sheridan house, the conversation with Dr. Edelman, and the conversations

with Randy's family, Agent Brandau drove to Salina to interview Pastor Rollins and Dana Flynn.

## Interview with Pastor Rollins: December 22, 1992

Agent Brandau and Detective Albert Buskey drove to Salina the night of the murder. Upon arriving at Pastor Rollins' house, no one was home. Pastor Rollins and his son Charles arrived about an hour later. Agent Brandau received Pastor Rollins' consent to search the house. Law enforcement officers found and removed shotgun shells from the house. Pastor Rollins would only allow Agent Brandau to take two of the shells found. To Agent Brandau, Pastor Rollins appeared nervous and upset when the shotgun shells were found. Pastor Rollins established an alibi. No shotgun was found in the house.

Law enforcement officers later returned to Pastor Rollins' house with a search warrant, and the remaining shotgun shells were seized. Officers also seized a card and envelope. The card was printed "For My Wife" on the front. The inside of the card contained the handwritten words "To My Angel, Snowflake, Dana" before the printed greeting. After the printed greeting, the card contained the handwritten signature "With All My Heart and Love, Your Husband, Jerry." The officers found a letter from SRS addressed to Dana and mailed to Dana's house. Officers also found in a dresser a copy of 2 pages from L. 1991, ch. 171, § 2, which is the Kansas statute amending the law regarding the custody of children. A number of items with either Dana's name or address were found in Pastor Rollins' house. A copy of the Adam & Eve invoice with the words "Praise the Lord" was also found. The envelope was postmarked July 29, 1992.

## Interview with Dana Flynn: December 23, 1992

After finishing at Pastor Rollins' house, Agent Brandau and Detective Buskey left to interview Dana at her house, arriving at 1 a.m. Dana quickly answered the door and appeared to have not been sleeping. Dana had no response to hearing the news of Randy's death. She again denied having a sexual relationship with

Pastor Rollins, saying her only contact with Pastor Rollins was "through the ministry."

Agent Brandau asked Dana what she had done on December 22, 1992. Dana said she woke at 6:30 a.m., fed her children, drove A.S. to school and J.F. to the babysitter, and arrived for work at Great Plains Manufacturing just before 8:30 a.m. Dana said she received a telephone call between 11 a.m. and 12 p.m. from her attorney. The telephone call upset her, she felt sick, and she left work at 12:13 p.m. She went to get gas in her car and called her mother from a pay telephone. Dana asked her mother to pick up J.F. and A.S. When asked by her mother what the problem was, Dana said she was upset over a development in the custody battle. Dana said she went to her mother's house, arriving after 1 p.m. and stayed until after 7 p.m.

## Dana's statements at Great Plains Manufacturing after the murder

Dana clocked in at Great Plains Manufacturing at 8:23 a.m. on December 22, 1992, and left at 12:13 p.m. She did not return to work that day. The day before, Dana clocked in at 8:29 a.m., had a lunch break from 12:31 until 2:33 p.m., and then left at 5:01 p.m.

Marla Reed, the payroll administrator for Great Plains Manufacturing, was Dana's supervisor. Reed testified that approximately 1 or 2 months before the murder, she observed that Dana was "visibly shaken and almost in tears." Reed described the conversation: "Well, I asked her if there—if she was okay, and she responded to me that her daughter's father was going to have her for the weekend, it was on a Friday, and she was very upset about that, because she said that he had been molesting her." The day after Randy's murder, Dana came to Reed to talk with her about the interview with law enforcement officers the previous night. Reed described the conversation: "She just said that they had been there that night and questioned her, and she said, 'But, I did not kill him.'"

## Interview with Mikel: December 23, 1992

Kirk Thompson, a KBI special agent, along with Joaquin Padilla, another special agent, met with Mikel on December 23, 1992, at Great Plains Manufacturing where Mikel also worked. Upon mentioning he wanted to discuss Randy's murder, Agent Thompson noticed that Mikel began twitching involuntarily. Mikel experienced shortness of breath, began breathing quickly and hard, and avoided eye contact. Mikel said his mother had told him of Randy's murder early that morning. Mikel said his family was collectively involved in the child custody battle with Randy and that he would probably be called as a witness.

Agent Thompson asked Mikel during the interview about his actions on December 22, 1992. At first, Mikel was vague about his activity. Mikel said he did not go to work because his knee was bothering him and that his mother drove him to see the doctor at 3:45 p.m.

Agent Thompson asked Mikel whether he had been with his sister that afternoon. Mikel said he had spent time with his sister up until 3:45 p.m. Mikel said he saw Dana at Dana's house, which contradicted Dana's story that she had been at her mother's house that afternoon.

The agents expressed some concern over his vague answers, and Mikel started over. Mikel said he awoke at noon and left to see his girlfriend. They drove to Dana's house, Mikel got out of the car and went inside, and his girlfriend continued to drive somewhere to pick something up. Mikel said she returned to Dana's house to pick him up, and then they drove to his mother's house, arriving at 3:30 p.m.

The evidence at trial showed that Mikel had visited the doctor at 4:45 p.m. for his knees. The doctor testified Mikel did not need immediate attention: "He walked in fine, he walked out fine." The doctor found no signs of recent injury.

The State presented evidence to the jury that the driving time from the murder scene near Junction City to Mikel's doctor in Salina, using two different alternative routes, was approximately 55 minutes.

## Mikel's attempts to secure alibis

The State presented evidence of Mikel's two failed attempts at securing false alibis. Mikel asked Charles Cookson, a coworker at Great Plains Manufacturing, to fabricate a false alibi for Dana. Cookson testified Mikel made the request for an alibi between 1 and 2 months after Randy's murder. Cookson told Mikel that he would think about it. Mikel approached Cookson at least two more times. Mikel explained to Cookson that both he and Dana had missed work on December 22, 1992; therefore, Cookson would make an ideal alibi witness. On one such occasion, Mikel handed Cookson a typed statement with the alibi:

"Met summer of 1990. Bought vitamins from me once or twice. Had already met and knew John.

"Tuesday December 22, 1992. I saw her at Dillons Southgate in the medicine area. Time: 2:50 p.m.

"Also saw her turning off from Ohio St. towards her mom & dads house. They live on Faith Drive. Time: 3:10—3:20 p.m."

John Dreiling, Mikel and Dana's brother, gave Cookson a paper with the telephone number of Dana's attorneys, along with a calling card number. Cookson eventually signed the alibi. At trial, Cookson denied having seen Dana in Dillon's on December 22, 1992, which contradicted his statement. Cookson testified that Charles Rollins told him it would be a good idea to sign the false alibi because "they were going to sue and that they believed in sharing the wealth."

Mikel also asked Joseph Gladback, a coworker at Great Plains Manufacturing, to provide him with a false alibi in August or September 1993. Mikel told Gladback he would "make it worth [his] while" if he would fabricate the alibi. Gladback refused. Later, Gladback asked Mikel if he had killed Randy, which Mikel did not deny but, rather, said he could not tell Gladback the answer to that particular question.

### Carwash

The State's evidence showed that Dana had driven her car through an automatic car wash twice around 5:15 p.m. on the day of the murder. Dana was alone.

### Dana's statement about Randy after the murder

After Randy's murder, Dana told a coworker, who had expressed regret at hearing of Randy's death, that the coworker need not be too sorry because he deserved to die and that he was a wicked and evil man.

### Cover-up evidence

Dana asked the daycare provider and an elementary teacher for A.S. not to speak with law enforcement officers. Another daycare provider cared for Dana's children from November 1992 until January 1993. On the day of the murder, Dana telephoned to tell the babysitter that Dana's mother would be picking up the children. She picked up the children at 4 p.m. The babysitter testified that she heard J.F. say in early January 1993 that he no longer had a dad and that his dad was a devil.

On January 19, 1993, Dana asked the babysitter whether the KBI had been asking questions. When the babysitter said she had spoken with the KBI, Dana was surprised and upset that the babysitter did not tell Dana about the incident. Dana did not employ this babysitter for J.F. or A.S. after that day.

### State's evidence: the perjury conspiracy

The State read into evidence portions of the inquisition testimony of Mikel's girlfriend, Jennifer Brock; Dana and Mikel's sisters, Cheryl Canfield and Brenda Arveson; Pastor Rollins' son, Charles; Dana and Mikel's mother, Shirley Dreiling; and Dana and Mikel's father, Norman Dreiling. These inquisition witnesses denied that the practices of speaking in tongues and prophesy occurred. Testimony indicated these practices involved statements that Randy was the devil and that "God would take care of Randy." Past members of the church contradicted the inquisition testimony by confirming that these practices did in fact take place. The State

presented overwhelming evidence that the practices of Pastor Rollins and other members of the Fountain of Life Church involved speaking in tongues and prophecy, and that Jennifer Brock, Cheryl Canfield, Brenda Arveson, Charles Rollins, Shirley Dreiling, and Norman Dreiling knew about such practices.

Kathlyn Garza, Pastor Rollins' daughter, testified that she had a telephone conversation with her father in which he asked her whether she had been contacted by Agent Brandau. Kathlyn told her father Agent Brandau had asked her about the practice of speaking in tongues. The prosecutor asked Kathlyn to describe her father's response to learning Agent Brandau was inquiring about the speaking in tongues practice: "He said I really didn't know the answers to those questions, that it was more serious than I knew." Kathlyn told her father she would testify if subpoenaed, and Pastor Rollins warned her to talk with the attorneys before giving any testimony. When asked about Pastor Rollins' specific concerns, Kathlyn said, "He said that I would be helping put him in prison." As a result of a wiretap, a recording and transcript of the conversation were procured. The State introduced both into evidence. The transcript showed that Pastor Rollins referred to Agent Brandau as "very wicked, very wicked, and very evil."

## Analysis

### 1. Failure to file a timely notice of appeal

Mikel's appellate counsel acknowledges the notice of appeal was filed out of time. A copy of her May 1, 2000, and June 23, 2000, letters to Mikel's trial counsel asking for an explanation is appended to Mikel's brief on appeal. Mikel's appellate counsel asserts that Mikel's trial counsel relied on Dana's trial counsel to file the notice of appeal. Mikel's trial counsel promised to send proof of the notice of appeal, but failed to provide any further information. However, nothing was filed that would allow the court to conclude that Mikel "was furnished an attorney for [the purpose of appeal] who failed to perfect and complete an appeal." *State v. Ortiz*, 230 Kan. 733, 736, 640 P.2d 1255 (1982).

This court in *State v. Ji*, 255 Kan. 101, 102-03, 872 P.2d 748 (1994), described the principles surrounding the right to appeal:

"The right of appeal is entirely a statutory right; no appellate review is required by the United States Constitution [citation omitted] or the Kansas Constitution [citation omitted]. It is the established rule in this state that this court has no jurisdiction to entertain an appeal by a defendant in a criminal case unless the defendant appeals within the time prescribed by the statutes providing for such an appeal. [Citations omitted.] The Supreme Court has only such appellate jurisdiction as is conferred by statute pursuant to Article 3, Section 3, of the Kansas Constitution, and when the record discloses a lack of jurisdiction, it is the duty of the Supreme Court to dismiss the appeal. [Citations omitted.]"

The *Ortiz* court held there are exceptions to the rule requiring a dismissal following an untimely filed notice of appeal "where a defendant either was not informed of his or her rights to appeal or was not furnished an attorney to exercise those rights or was furnished an attorney for that purpose who failed to perfect and complete an appeal." 230 Kan. at 736. There is authority for remanding this case for a hearing to determine whether this case falls within the exceptions described in *Ortiz*. See *State v. Medina,* 256 Kan. 695, 701, 887 P.2d 105 (1994). However, this court has also held that the exceptions in *Ortiz* apply based on an affidavit alone, rather than a specific factual finding by the lower court. See *State v. Shortey,* 256 Kan. 166, 168, 884 P.2d 426 (1994).

This court in *Shortey* considered Jesse Shortey's appeal from a conviction of aggravated robbery and aggravated assault on a law enforcement officer. The court noted that Shortey's notice of appeal was at least 20 days late. The court cited the passage from *Ji* quoted above and then discussed the exceptions found in *Ortiz,* emphasizing the language "or was furnished an attorney for that purpose who failed to perfect and complete an appeal." 256 Kan. at 168. In its analysis, the *Shortey* court found that an *Ortiz* exception applied without remanding the case:

"Defendant has filed an affidavit of the appointed counsel responsible for the filing of the notice of appeal which sets forth the post-trial proceedings herein and which concludes: 'I didn't realize that Notice of Appeal needed to be filed earlier. If that is indeed the case, it is wholly my fault, as Mr. Shortey has taken every step to insure that his appeal is prosecuted.'

"Under the circumstances herein, we conclude that the exception set forth in *Ortiz* should be applied, and we will, accordingly, entertain defendant's appeal." 256 Kan. at 168.

By order of this court, Mikel's case was remanded to the district court to determine the applicability of one of the exceptions noted in *Ortiz*. The trial court made a finding of fact, including the fact that "the defendant had an attorney for the purpose of perfecting and completing his appeal, but that the Defendant's attorney failed to do so." In light of the trial court's findings, along with other evidence in the record, we find that fundamental fairness requires this court to retain jurisdiction over the appeal. See *State v. Shortey*, 256 Kan. at 168.

## 2. Sufficiency of Evidence

Mikel contends the State presented insufficient evidence to support his conviction. We apply the following standard of review to a challenge of the sufficiency of the evidence: "When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Jamison*, 269 Kan. 564, 571, 7 P.3d 1204 (2000). "A guilty verdict in a criminal case will not be disturbed on appeal if there is substantial evidence, even though the evidence is entirely circumstantial." *State v. Scott*, 271 Kan. 103, 107, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001).

### *First-degree murder*

Mikel argues on appeal that the State presented insufficient evidence to support the murder charge. We disagree and find the State presented sufficient evidence to support the jury's verdict.

At the time of Randy's murder, Kansas statutes defined first-degree murder, in part, as: "Murder in the first degree is premeditated murder." K.S.A. 1992 Supp. 21-3401(a). "Premeditated murder" was defined as "the killing of a human being committed maliciously, willfully, deliberately and with premeditation." K.S.A. 1992 Supp. 21-3401(b).

The jury in this case was instructed to find Mikel guilty of first-degree murder if it found the State had proved:

"1. That the defendant intentionally killed Randall Sheridan;

"2. That such killing was done maliciously;

"3. That it was done deliberately and with premeditation; and

"4. That this act occurred on or about the 22nd day of December, 1992, in Geary County, Kansas."

During closing arguments, the prosecutor argued to the jury that Mikel was the shooter and that Dana was along for the ride. By confining the analysis of the first-degree murder charge and the conspiracy to commit murder charge, the only issue was whether Mikel, with Dana's help, intentionally shot Randy. If this element was established according to the appropriate standard of review, the jury could have reasonably concluded the other necessary elements of both first-degree murder and conspiracy to commit first-degree murder beyond a reasonable doubt.

The State presented sufficient evidence for a reasonable jury to find Mikel shot Randy and that Dana aided and abetted him in this act. The summary of the testimony above suggests the jury was faced with multiple motives to conclude Dana wanted Randy dead. Further, the trial court instructed the jury that motive alone was insufficient: "A finding of guilty for the crime of murder may not be based solely upon evidence of motive. Rather each element of the crime must be proved beyond reasonable doubt." The trial court also instructed the jury that inferences alone were not sufficient to establish any elements of any of the crimes: "You may not find an element of a crime from an inference that is based solely upon an inference. However, you may draw reasonable inferences from facts established in the evidence."

The State argued five motives: (1) to thwart Randy's attempt to gain custody of A.S., (2) to end Randy's alleged molestation of A.S., (3) to thwart Randy's attempts at exposing Dana's relationship with Pastor Rollins, (4) the belief that Randy was evil or that Randy was the devil, and (5) following orders from Pastor Rollins.

We find the State presented substantial evidence of motive. Dana needed a way out of the litigation with Randy for a number of reasons. Randy, with the critical help of Pottroff, maneuvered Dana into a corner. She had been recorded in a deposition as saying A.S. did not spend any significant time with Pastor Rollins. Randy

and Pottroff knew this to be untrue; therefore, Pottroff crafted a court order to restrain A.S. from associating with Pastor Rollins, thereby putting Dana in the difficult position between choosing between A.S. and Pastor Rollins. Had Randy obtained custody of A.S., it might have allowed A.S. an opportunity to get to know her real father and possibly discover he was not the "evil" person she had been told he was.

The evidence before the jury demonstrated that SRS was concerned that Dana had coached A.S. to make untruthful allegations. SRS considered this coaching to be emotionally harmful to A.S., and it could have been grounds for Dana to lose custody of A.S.

Motive alone is insufficient to sustain a conviction. See *State v. Doyle,* 201 Kan. 469, 487, 441 P.2d 846 (1968) ("It must be remembered that motive, though an important factual element, is not sufficient in itself to sustain a conviction."). However, motive evidence was not the only evidence presented by the State.

Although there were other people who had a motive to kill Randy, namely, the husband of a woman with whom Randy had an affair, the State is not burdened with disproving each alternative defense theory.

The December 7, 1992, threat to Steve Flynn is significant. The State presented evidence that Steve and Randy were similarly situated. They both had a child with Dana, they both were fighting Dana over custody and supervision, and they both had a young child who believed their respective father was evil based on Dana's statements. When Steve pushed Dana too far with regard to J.F., Dana arrived at Steve's place of work with Mikel and a heated confrontation followed. Mikel threatened Steve with the "I'm going to take you down" language and Dana responded by telling Mikel that then and there was not the appropriate time to take Steve down. While Mikel would attempt to explain to the jury that, as a former wrestler, it should be clear that the "take down" language refers to a seemingly innocuous wrestling maneuver, there was no wrestling involved in this case and the jury was reasonable in concluding that more serious matters were intended to be conveyed.

The December 12, 1992, telephone call, viewed in the light most favorable to the State, is significant. The jury could reasonably con-

clude the telephone call was a death threat from Mikel to Randy. Judith testified she heard the words "die" or "dead." Judith also heard Randy refer to the caller as "Mikey," a derogative term Randy used for Mikel. The jury could have reasonably concluded the telephone call was a forecast, *i.e.*, "drop the custody fight or you are dead." Randy did not drop the custody battle. The evidence shows Randy was proceeding with the custody battle, which was causing Dana concern with regard to her desire for sole custody of A.S. and with her relationship with Pastor Rollins. Dana stated she would "do anything" to keep Randy from getting A.S.

The testimony of Randy's attorney provided evidence that despite court orders for extended visitation Dana did not intend to let Randy have custody of A.S.

The State presented evidence of Dana's opportunity to commit this crime. Dana left work shortly after noon on December 22, 1992, after having a telephone conversation with her lawyer, the bearer of bad news in terms of the custody battle. The evidence shows it was likely that Dana knew through her attorney that Randy was home that day. Her own statements following the murder establish that she purchased fuel for her car and telephoned her mother from a pay telephone to arrange for someone to pick up J.F. and A.S. Mikel's own statements established that he was with his sister that afternoon, which likewise established his opportunity to commit this crime.

There is nothing at the scene of the crime to link to either Dana or Mikel. However, the evidence of Dana's actions after the murder further strengthen the conclusion the jury acted reasonably in convicting. After Randy's murder, the evidence shows Dana drove her car through an automatic carwash twice. This evidence was sufficient to allow the jury to arrive at a logical conclusion that Dana's car was soiled with either Randy's blood or dirt from the road. Further, the evidence shows that after the murder Dana believed Randy was an evil, wicked man who deserved to die.

In considering the sufficiency of evidence to sustain a conviction, this court looks only to the evidence in favor of the verdict; it does not weigh the evidence. *State v. Pondexter*, 234 Kan. 208, 212, 671 P.2d P.2d 539 (1983). In light of this standard, we are convinced

a rational factfinder could have found beyond a reasonable doubt that Mikel, with Dana's help, shot Randy.

### Conspiracy to commit murder

Mikel argues the State presented insufficient evidence to support the conspiracy to commit first-degree murder conviction. The definition of conspiracy applicable to the date of the crime herein is found at K.S.A. 21-3302 (Ensley 1988):

"(1) A conspiracy is an agreement with another person to commit a crime or to assist to commit a crime. No person may be convicted of a conspiracy unless an overt act in furtherance of such conspiracy is alleged and proved to have been committed by him or by a co-conspirator."

The only amendment to this section since 1992 involved replacing "to commit" with "in committing" and replacing "him" with "such person." L. 1992, ch. 239, § 35.

The jury was instructed to find Mikel guilty of conspiracy to commit first-degree murder if it found:

"1. That the defendant agreed with another or others to commit the crime of murder in the first degree;

"2. That the defendant did so agree with the intent that the crime of murder in the first degree be committed;

"3. That the defendant or any party to the agreement acted in furtherance of the conspiracy by murdering Randall Sheridan;

"4. That this act occurred on or about the 22nd day of December, 1992, in Geary County, Kansas."

The trial court defined "conspiracy" for the jury as follows:

"A conspiracy is an agreement with another or other persons to commit a crime or to assist in committing a crime, followed by an act in furtherance of the agreement.

"The agreement may be established in any manner sufficient to show understanding. It may be oral or written, or inferred from all of the facts and circumstances."

The sufficiency of the evidence for the underlying crime, murder, is considered above. The murder qualifies as an overt act for purposes of conspiracy to commit murder. See *State v. Wilkins,* 267 Kan. 355, 365, 985 P.2d 690 (1999). Further, the evidence to support the finding of an agreement need not be direct, but can

be supported by circumstantial evidence. See *State v. Webber*, 260 Kan. 263, 288, 918 P.2d 609 (1996), *cert. denied* 519 U.S. 1090 (1997).

The evidence in this case, viewed in a light most favorable to the State, supports the jury's finding beyond a reasonable doubt that Mikel agreed with his sister to commit the crime of first-degree murder by shooting Randy.

### Terroristic threat

Mikel argues the State presented insufficient evidence to support the conviction of terroristic threat. The statute applicable at the time, K.S.A. 21-3419 (Ensley 1988), defined terroristic threat as "any threat to . . . [c]ommit violence communicated with intent to terrorize another."

The trial court instructed the jury to find Mikel guilty if it found:

"1. That the defendant threatened to commit violence;

"2. That such threat was communicated with the intent to terrorize Randall Sheridan;

"3. That this act occurred on or about the 12th day of December, 1992, in Geary County, Kansas."

Mikel concedes in his brief on appeal that Judith heard the words "die" or "dead" and that Mikel made the call. Mikel argues the evidence only supports the conclusion that the threat was communicated to Judith, not Randy. However, this argument ignores the fact that Randy identified Mikel's voice. Randy said, "Why don't you grow up, Mikey?" Mikel argues Randy could have assumed it was Mikel making the call. This argument fails in light of our standard of review. In a light most favorable to the prosecution, Randy, like Judith, heard words amounting to a threat to which Randy responded by saying, "Why don't you grow up, Mikey?" The jury reasonably found Mikel guilty of making a terroristic threat.

## 3. Materiality of conspiracy to commit perjury

Mikel contends that the trial court erred in allowing the jury to determine whether the perjury involved a material fact. The definition of perjury applicable to crimes committed prior to July 1, 1993, is found at K.S.A. 1992 Supp. 21-3805:

"(a) Perjury is willfully, knowingly and falsely [(1)] swearing, testifying, affirming, declaring or subscribing to any material fact upon any oath or affirmation legally administered in any cause, matter or proceeding before any court, tribunal, public body, notary public or other officer authorized to administer oaths; or

"(2) subscribing as true and correct under penalty of perjury any material matter in any declaration, verification, certificate or statement as permitted by K.S.A. 1992 Supp. 53-601."

The perjury statute was amended in 1992 by substituting "intentionally" for "willfully." L. 1992, ch. 298, § 52. The amendment was not effective until July 1, 1993. L. 1992, ch. 298, § 98. Other amendments have changed the penalty, L. 1993, ch. 291, § 99 and L. 1994, ch. 291, § 35, or added an additional definition, L. 1997, ch. 182, § 86.

The trial court instructed the jury on the following definition of perjury:

"The definition of perjury, the crime charged to be the subject of the conspiracy is the willful, knowing, and false testifying or swearing to a material fact upon oath legally administered by a person authorized to give oaths.

"Willful and knowing means intentional and not accidental.

"A material fact is a fact which has a natural tendency to influence, or was capable of influencing, the decision making body to which it was addressed. It need not bear directly on the ultimate issue to be determined in the cause or hearing."

An instructions conference was held off the record on Friday, November 22, 1996, and Sunday, November 24, 1996. Prior to closing arguments, the State made a record of the fact that the trial court did not instruct on a lesser included offense. Also, the State made a record that Dana opposed the limiting instruction under K.S.A. 60-455. However, there does not appear to be an objection to the instruction on materiality. K.S.A. 22-3414(3), as it appeared at the time of the crime and trial, provided in part as follows:

"No party may assign as error the giving or failure to give an instruction unless he objects thereto before the jury retires to consider its verdict stating distinctly the matter to which he objects and the grounds of his objection unless the instruction is *clearly erroneous*. Opportunity shall be given to make the objections out of the hearing of the jury."

K.S.A. 22-3414 was amended in 1998 to make the above rule explicitly applicable to instructions on lesser included crimes and to

remove the masculine pronouns. L. 1998, ch. 185, § 3. Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a difference verdict if the trial error had not occurred. *State v. Evans*, 270 Kan. 585, 588, 17 P.3d 340 (2001).

In *State v. Rollins,* 264 Kan. 466, 475, 957 P.2d 438 (1998), this court held that "[i]n a criminal prosecution where the defendant is charged under a state statute with perjury, the trial court is to determine as a matter of law if the alleged false testimony or writing was on a material matter." The rule in *Rollins* is consistent with *State v. Frames,* 213 Kan. 113, 515 P.2d 751 (1973). The defendant in *Frames* argued the trial court erred in submitting "the question of materiality to the jury as a question of fact." 213 Kan. at 119. The court agreed that allowing the jury to decide the matter was error but affirmed the conviction. First, the *Frames* court found the statements were material as a matter of law. Second, the court found the defendant was not prejudiced by the instruction. 213 Kan. at 119-20.

Applying the approach in *Frames* to this case, Mikel's argument fails. Initially, we note Mikel fails in his brief on appeal to argue that the perjury was not based on a material fact. We find the false testimony involving speaking in tongues and prophesy was intended to conceal the facts surrounding Randy's death. Therefore, we find the perjury involved a material fact with regard to a proceeding which was designed to uncover the circumstances under which Randy died. Considering K.S.A. 22-3414(3), the instruction was not clearly erroneous in the sense that the jury would have rendered a different verdict had the error not occurred. The error required the jury to make a finding above and beyond what the law required. In this sense, the error actually made the burden for the State greater. Mikel was not prejudiced as a result of this error.

## 4. Evidence of Mikel's prior conduct

Mikel argues the trial court improperly admitted evidence of his prior bad conduct. Mikel complains exclusively of the evidence of the altercation between Steve Flynn, Mikel, and Dana at Steve's place of work. The trial court properly admitted this evidence, both

on the grounds that it was admissible under K.S.A. 60-455 and admissible as relevant evidence independent of K.S.A. 60-455. In admitting the evidence, the trial court gave the following cautionary instruction:

"Evidence may now be admitted concerning a crime or a civil wrong other than the present crimes charged. This evidence may be considered by you solely for the purpose of proving the defendant's intent or motive."

All relevant evidence is admissible. K.S.A. 60-407(f). Relevant evidence is defined as "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). Relevancy is more a matter of logic and experience than of law. *State v. Sexton,* 256 Kan. 344, 349, 886 P.2d 811 (1994). Evidence is relevant if it renders the desired inference more probable than it would be without the evidence, or if it has any tendency in reason to prove any material fact. 256 Kan. at 349. Where the probative value is substantially outweighed by the risk of unfair prejudice, even relevant evidence may be excluded by the judge. *State v. Lee,* 266 Kan. 804, 813, 977 P.2d 263 (1999).

The standard of review for the admission of evidence states:

"The admission of evidence lies in the sound discretion of the trial court. An appellate court's standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. One who asserts that the court abused its discretion bears the burden of showing such abuse of discretion." *State v. Whitesell,* 270 Kan. 259, 276-77, 13 P.3d 887 (2000).

K.S.A. 60-455 provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible *when relevant to prove some other material fact including motive,* opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." (Emphasis added.)

Three requirements must be met for the proper introduction of evidence under K.S.A. 60-455: "(1) The evidence is relevant to

prove one of the facts specified in the statute; (2) the fact is a disputed, material fact; and (3) the probative value of the evidence outweighs its potential prejudice." *State v. Simkins,* 269 Kan. 84, 92, 3 P.3d 1274 (2000).

*State v. Carr,* 265 Kan. 608, 963 P.2d 421 (1998), involved a trial for first-degree felony murder in the death of the defendant's daughter. At trial, the State introduced evidence of Carr's abusive behavior toward the victim's brother. The court considered whether such evidence was properly admitted, independent of K.S.A. 60-455, to show the relationship between the defendant and the victim in light of the fact that the evidence involved the defendant and a party other than the victim. The court found the evidence of the defendant's abuse of the victim's brother "highly relevant to show her pattern of discipline towards both the children." 265 Kan. at 625. Further, the court found that the evidence of the defendant's treatment of the victim's brother was "part and parcel of her relationship with [the victim]." 265 Kan. at 625; see *State v. Wimbley,* 271 Kan. 843, 853, 26 P.3d 657 (2001) ("The ongoing relationship between the defendant and the victim was relevant to show the ongoing violent relationship between the parties and renders the inference that the defendant, having once before beaten Tina when she discussed leaving him, and having acted violently toward her in the past, killed her when she contemplated making a final break from him.").

We find the evidence of the confrontation to be admissible as evidence of motive under K.S.A. 60-455 and as relevant evidence to show the continuing relationship between the parties. Steve and Randy were similarly situated. When Steve's actions with respect to J.F. went too far, Dana resorted to calling her brother, Mikel, for assistance. Similarly, the State presented the evidence of the confrontation between Mikel and Steve to allow the jury to draw the reasonable inference that when Randy similarly pushed Dana too far, she called on Mikel to put a final end to the dispute between her and Randy.

## 5. Failure to sever conspiracy to commit perjury charge from murder charges

Mikel argues that the trial court erred in failing to sever the perjury charge from the murder charges.

The rules governing multiple crimes and defendants in the same trial are governed by K.S.A. 22-3202:

"(1) Two or more crimes may be charged against a defendant in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

*State v. Barksdale,* 266 Kan. 498, 507, 973 P.2d 165 (1999), repeated the well-established standard of review of joinder issues: "Whether a defendant will be tried on separate charges in a single trial is a matter within the discretion of the trial court, and the trial court's decision will not be disturbed on appeal unless there is a clear showing of abuse of discretion." Thus, the question for this court is whether no reasonable person would agree with the trial court's decision to try the murder offenses with the perjury offense. See *State v. Plaskett,* 271 Kan. 995, 1019, 27 P.3d 890 (2001). The defendant has the burden of showing prejudice requiring reversal. *State v. Crawford,* 255 Kan. 47, 54, 872 P.2d 293 (1994). The Court of Appeals has described the threshold for meeting the connection element of K.S.A. 22-3202(1) as minimal. *State v. Shively,* 26 Kan. App. 2d 302, 312, 987 P.2d 1119 (1999), *aff'd* 268 Kan. 589, 999 P.2d 259 (2000) ("The trial court's decision is also supported by previous Kansas law demonstrating the minimal requirements for meeting the connection element of K.S.A. 22-3202[1].").

Consideration of a number of this court's opinions construing K.S.A. 22-3202 shows that Mikel's argument has no merit. In *State v. Moore,* 226 Kan. 747, 602 P.2d 1359 (1979), this court considered the appeal of the defendant who had been tried jointly on two separate district court cases—one case involved aggravated robbery and kidnapping, and the other involved corruptly influencing a witness and unlawful deprivation of property. A trial on

the first case ended in a mistrial, and the second case was not filed until after the first case had gone to trial. Upon retrial, the two cases were jointly tried. The charges in the second case arose out of the defendant's failed attempt to secure the false testimony of a witness to aid him in the defense of the first case. On appeal, the defendant argued that the court erred in consolidating the cases and that the consolidation "unduly prejudiced his defense." 226 Kan. at 749. The State argued that the joinder of the two cases was proper "because the defendant would not have committed the acts giving rise to the corruptly-influencing-a-witness charge but for the aggravated robbery and kidnapping charges," and that therefore the cases were "necessarily 'connected' and properly joined for trial." 226 Kan. at 749.

*Moore* noted that no Kansas cases had addressed the issue, but that K.S.A. 22-3202 was in substance similar to the federal rules, and further noted that federal cases "consistently hold that when criminal conduct resulting in a second charge is precipitated by a previous charge, the two are considered sufficiently 'connected together' to allow consolidation for trial." 226 Kan. at 749. The court held it was not an abuse of discretion to join the cases because the two cases were sufficiently "connected together" under K.S.A. 22-3202 because the first case "precipitated the conduct" in the second case. 226 Kan. at 750. The court did not address the issue of whether the defendant was unduly prejudiced in his defense as a result of the joinder.

*State v. Pondexter,* 234 Kan. 208, 671 P.2d 539 (1983), relied on *Moore.* The *Pondexter* court considered the defendant's convictions of aggravated assault of a law enforcement officer, unlawful possession of a firearm, burglary, and attempted murder. The aggravated assault of a law enforcement officer charge and the unlawful possession of a firearm charge arose out of an October 22, 1981, incident in which two undercover police officers tried to purchase drugs from the defendant. On March 22, 1982, the defendant failed to appear for the trial on these two charges. On April 2, 1982, the defendant tried to kill one of the undercover officers, which was the basis for the attempted murder charge. On appeal,

the defendant argued the trial court erred in consolidating the charges for the two separate incidents.

*Pondexter* quoted K.S.A. 22-3202 and then quoted from the analysis in *Moore.* 234 Kan. at 216-17. The court concluded:

> "The case at bar is factually similar to the situation in *Moore.* Here the evidence presented by the State indicates the appellant wanted to kill Mullikin to prevent him from testifying at his trial for unlawful possession of a firearm and aggravated assault on a law enforcement officer. Clearly the crimes charged in the earlier action precipitated the conduct resulting in the attempted murder and burglary charges. The charges arising out of the two incidents were properly consolidated for trial." 234 Kan. at 217.

In *State v. Walker,* 244 Kan. 275, 768 P.2d 290 (1989), the defendant was convicted of two counts of aggravated criminal sodomy and two counts of endangering a child, based on her abuse of her two stepsons. The defendant was also convicted of one count of making a terroristic threat. The threat charge arose out of her comments to a hospital social worker after she was not allowed to visit one of the victims, who had been admitted to a psychiatric hospital. The threat occurred after the two counts of endangering a child were filed, but at about the same time the investigation into the sodomy incidents took place. On appeal, the defendant argued the trial court erred in consolidating the terroristic threat charge with the charges involving her stepsons.

The court acknowledged that the charge of terroristic threat and the charges involving the defendant's stepsons were not of the "same or similar character or based upon the same acts or transactions"; however, the court noted the State's argument—based on *Moore* and *Pondexter*—that the charges merely need be "connected together." 244 Kan. at 278-79. *Walker* summarized the two prior cases and then noted that while Walker's case was not as strong as the defendants' cases in *Moore* and *Pondexter,* it was sufficiently "connected together" because the charges involving the defendant's stepsons precipitated the threat charges. 244 Kan. at 278-79 ("The earlier charges precipitated the factual setting which led appellant to make the threat against [the victim].").

The *Walker* court did not end its analysis with consideration of K.S.A. 22-3202. The court went on to note that the defendant must

in any event "demonstrate prejudice which would justify reversal." 244 Kan. at 279-80. This showing of prejudice, held the *Walker* court, had not been made because the evidence was strong on the most serious charges, and the jury's failure to convict on both terroristic charges demonstrated that the jury had "carefully considered the evidence and each separate charge." 244 Kan. at 280.

*State v. Anthony*, 257 Kan. 1003, 898 P.2d 1109 (1995), rejected an argument that the joinder of the defendant's charges for premeditated first-degree murder, aggravated robbery, sale of cocaine within 1,000 feet of a school, and unlawful possession of a firearm was improper. On the murder and robbery charges, the defendant was jointly tried with two other defendants. The drug charge was based on evidence gathered during a drug sting operation involving a confidential informant. The night following the murder and robbery of a motel night clerk, the defendant visited the confidential informant to sell drugs. While there, the defendant made statements linking himself to the robbery and murder of the motel night clerk. On appeal, the defendant argued the trial court erred in refusing to sever the sale of cocaine charge from the murder and robbery charges.

The court focused on the "connected together" language in K.S.A. 22-3202. 257 Kan. at 1016. The *Anthony* court's analysis is instructive:

"The sale of cocaine charge in this case is based upon what occurred when Anthony went to Lamar Williams' apartment to sell cocaine. At the time, Anthony was selling cocaine to Lamar Williams, the police were taping Anthony's statement which provided direct evidence of his involvement in the robbery and murder at the motel. Similarly, the unlawful possession of a firearm charge resulted from a search of Anthony's car to uncover more evidence of the robbery and murder.

"While the robbery and murder are separate and distinct charges from the sale of cocaine and unlawful possession of a firearm charges, all the charges are connected together. It would be very difficult to introduce evidence of the defendant's incriminating statement regarding the robbery and murder without establishing the context within which the defendant's statement was made. The statement was being taped because this was an undercover drug operation by the police, and the statement was made while Anthony was selling cocaine to the police undercover informant. Similarly, although somewhat differently, the gun was discovered during a search seeking evidence of the murder and robbery. The connection between the selling of cocaine and possession of the weapon on the one hand and the motel

murder and robbery on the other hand is real and substantial enough to allow joinder. At the very least, we believe that reasonable persons could disagree on the ruling of the trial court, and we do not, therefore, find an abuse of discretion in granting joinder." 257 Kan. at 1016-17.

The crimes in this case are closely related and connected. The perjury—which was designed to conceal beliefs that God would take care of Randy, that Randy was evil, and that it was not God's will that Randy have custody of A.S.—was used to conceal the murder. These beliefs establish a motive for killing Randy and, therefore, establish the necessary connection under K.S.A. 22-3202(1) for joinder.

Mikel argues that the perjury charge should have been tried separately because the subject matter of the perjury did not involve details of the murder. Mikel argues that in order to be relevant, speaking in tongues would actually have to have caused the death of Randy. This argument ignores the probative value of the State's evidence regarding the Fountain of Life Church and its members' practices of speaking in tongues and prophesying. While speaking in tongues and prophesying are facially innocuous, when they involve labeling someone as "evil" and "the devil" and inform the audience that in effect God does not want a man to have custody of his daughter, then they become relevant to the motive for murder, and, therefore, relevant evidence.

## 6. Violation of Mikel's First Amendment Right to Free Exercise of Religion

Mikel argues the trial court violated his First Amendment rights. The First Amendment provides, in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const., 1st Amend. Mikel also argues his rights under the Kansas Constitution are implicated. Section 7 of the Kansas Constitution Bill of Rights provides in relevant part:

"The right to worship God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend or support any form of worship; nor shall any control of or interference with the rights of conscience be permitted, nor any preference be given by law to any religious establishment or mode of worship. No religious test or property qualification shall be required for

any office of public trust, nor for any vote at any election, nor shall any person be incompetent to testify on account of religious belief."

K.S.A. 60-430 provides: "Every person has a privilege to refuse to disclose his or her theological opinion or religious belief unless his or her adherence or nonadherence to such an opinion or belief is material to an issue in the action other than that of his or her credibility as a witness."

This court in *State v. Leitner*, 272 Kan. 398 Syl. ¶ 4, 34 P.3d 42 (2001), held:

"Although there is no per se barrier to the introduction of evidence of a person's membership or participation in a religious group or association, to be admissible such evidence should be related to the commission of the crime charged or should be used to show a person's possible bias or motive."

The State in *Leitner* introduced evidence of the defendant's participation in the Wicca pagan religion. With that evidence, the State hoped to counter the defendant's evidence that the victim abused her by pointing out how the defendant participated in an activity disapproved by the victim. This court concluded that evidence of the defendant's Wicca beliefs had no relevance to the crimes of first-degree murder of her ex-husband and that the probative value of the evidence was outweighed by unfair prejudice. However, the court determined the admission of the evidence was harmless.

Mikel relies on *United States v. Beasley*, 72 F.3d 1518 (11th Cir. 1996), which involved evidence of a religious cult. On appeal, the defendant argued that a conviction based on the defendant's religious practices was improper. The court disagreed. "A person's beliefs, superstitions, or affiliation with a religious group is properly admissible where probative of an issue in a criminal prosecution." 72 F.3d at 1527. In *Beasley*, the court found the testimony of the defendant's faith was "highly relevant to the jury's understanding of the existence, motives, and objectives of the RICO conspiracy and the means by which it was conducted." 72 F.3d at 1527. The court was confident the religion itself was not on trial, but that evidence regarding the religion was relevant because the "religious teachings were used to justify, rationalize, and promote crime." 72 F.3d at 1527.

Similarly, Mikel's First Amendment argument and argument under K.S.A. 60-430 fail. The religious practices themselves are not relevant. However, when a defendant's religious practices involve beliefs and statements such as that the victim molested a child, the victim was evil, the victim was the devil, and God would "take care" of the victim, they become relevant in a criminal prosecution because they tend to establish a motive for the defendant to commit the crime.

## 7. Cumulative error

Mikel argues cumulative errors in this case denied him his right to a fair trial. His claim is without merit. In the five assertions of error, only one instruction error was found to exist. We concluded that this error was not clearly erroneous and provided no basis for reversal of his convictions. Thus, the defendant's claim of cumulative error fails.

Affirmed.

DAVIS, J., not participating.
JONES, S.J., assigned.